## ATTORNEY GRIEVANCE COMMISSION OF MARYLAND *v.* JAY SETH ENGERMAN

[Misc. (BV) No. 13, September Term, 1979.]

*Decided January 19, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Henry J. Myerberg, Assistant Bar Counsel,* for petitioner.

*Robert E. Cahill* for respondent.

PER CURIAM

The Attorney Grievance Commission, acting through Bar Counsel, filed a petition for disciplinary action against Jay Seth Engerman, alleging violations of the Disciplinary Rules of the Code of Professional Responsibility. We referred the matter, pursuant to Maryland Rule BV9 b, to Albert L. Sklar, an Associate Judge of the Supreme Bench of Baltimore City, to make findings of fact and conclusions of law. After conducting an evidentiary hearing, Judge Sklar filed detailed findings and conclusions as follows:

> The tripartite petition asserted that the Review Board of the AGC, pursuant to Rule BV7 of the Maryland Rules of Procedure, directed Bar Counsel to file charges against the Respondent, which charges are alleged in three sections of the Petition filed: (1) Part A of the Petition concerning Rudolph Queen, Sr., a former client; (2) Part B of the Petition concerning Steven and Eleanor Queen, former clients; and (3) Part C of the Petition concerning James Harris and Michael Hughes, allegedly

former clients. Bar Counsel asked the Court of Appeals to take such disciplinary action as it thought appropriate.

By an Order dated January 25, 1980, the Court of Appeals responded to Bar Counsel's allegations that Respondent did unethically and unprofessionally violate certain provisions of the Disciplinary Rules (DR) of the Code of Professional Responsibility (CPR) and transmitted the charges to the Supreme Bench of Baltimore City (Eighth Judicial Circuit) to be heard and determined by the undersigned pursuant to Rule BV9 et seq.

The pertinent disciplinary rules which Bar Counsel claims have been unethically and unprofessionally violated are:

Disciplinary Rule 1-102

"Misconduct.

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

Disciplinary Rule 2-103

"Recommendation of Professional Employment.

(C) A lawyer shall not compensate or give anything of value to a person or organization to recommend or secure his employment by a client, or as a reward for having made a recommendation resulting in his employment by a client, except that he may pay the usual and reasonable fees or dues charged by any of the organizations listed in DR 2-103 (E).

(D) A lawyer shall not request a person or organization to recommend or promote the use of his services or those of his partner or

associate, or any other lawyer affiliated with him or his firm, as a private practitioner, except that:

(1) He may request referrals from a lawyer referral service operated, sponsored, or approved by a bar association and may pay its fees incident thereto.

(2) He may cooperate with the legal services of any of the offices or organizations enumerated in DR 2-103 (E) (1) through (4) and may perform legal services for those to whom he was recommended by it to do such work if:

    (a) The person to whom the recommendation is made is a member or beneficiary of such office or organization; and

    (b) The lawyer remains free to exercise his independent professional judgment on behalf of his client."

Disciplinary Rule 5-103

"Avoiding Acquisition of Interest in Litigation.

(B) While representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to his client, except that a lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses."

Disciplinary Rule 5-106

"Settling Similar Claims of Clients.

(A) A lawyer who represents two or more clients shall not make or participate in the making of

an aggregate settlement of the claims of or against his clients, unless each client has consented to the settlement after being advised of the existence and nature of all the claims involved in the proposed settlement, of the total amount of settlement, and of the participation of each person in the settlement."

Disciplinary Rule 9-102

"Preserving Identity of Funds and Property of a Client.

(B) A lawyer shall:

    (1) Promptly notify a client of the receipt of his funds, securities, or other properties.

    (2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.

    (3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

    (4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

In brief, the Bar Counsel's allegations are as follows. In Part A of the Petition, Bar Counsel charges that the Respondent violated DR 2-103 by suggesting and arranging with Rudolph Queen, Sr., that if Queen would refer clients to Respondent, he, the Respondent, would pay him money and that Queen did, in fact, refer many clients to Respondent who did, in fact, pay Queen for such referrals. In Part B of the Petition, Bar Counsel claims that the Respondent violated DR 2-103 by paying Steven and Eleanor Queen for

referring clients and that he violated DR 5-103 by advancing monies to the Queens for purposes other than for the proper expenses of litigation. And in Part C of the Petition, Bar Counsel alleges that the Respondent or his agent violated DR 9-102 by continuing to press claims for alleged damages that James Harris and Michael Hughes may have had against State Farm Insurance even after both clients or their agent had advised the Respondent that neither wished to pursue each of their potential claims. Further allegations in Part C of the Petition involved the unauthorized signing or alleged forging of Harris' and Hughes' signatures on Personal Injury Protection (PIP) applications, forms and endorsements of PIP checks. Moreover, in each part of the Petition, Bar Counsel alleges that the Respondent violated DR 1-102, the Disciplinary Rule which governs all "conduct that adversely reflects on [one's] fitness to practice law."

The Respondent was served on February 5, 1980, and answered the Petition on February 15, 1980. Included in the Respondent's Answer was an allegation that Bar Counsel was guilty of laches with respect to the charges set forth in Parts A and B of the Petition. Also on February 15, 1980, the Respondent filed a Motion for Separate Trial of Claims in Part C of the Petition.

Oral argument was heard on March 28, 1980, before this Court on Respondent's Motion for Separate Trials. The Respondent's attorney, Robert E. Cahill, Esquire, argued that Bar Counsel knew of the allegations contained in Parts A and B of the Petition no later than August 31, 1976, but failed to notify the Respondent of those charges until January, 1979. The Respondent alleged that this was a prejudicial, unwarranted delay which, in turn, allowed Bar Counsel to join the "totally unrelated and dissimilar" claims of Part C to the charges of Parts A and B. Citing the delay involved, the difference between the charges brought in Part C with the rest of the Petition, and the potential prejudice which could arise if all parts of the Petition were heard together, the Respondent argued to have the claims asserted in Part C adjudicated separately.

Bar Counsel, represented by Henry J. Myerberg, cited *Attorney Grievance Commission of Maryland v. Stewart,*

285 Md. 251 (1979) and *State v. Hutchinson,* 260 Md. 227 (1970) in his effort to persuade this Court that no prejudice would arise if all three parts of the Petition were heard together. Bar Counsel urged that granting a bifurcated trial because of the potential prejudice Respondent alleged would be tantamount to ignoring "the professional expertise, experience and judicial temperament with which our legal system has inherently invested a trial judge vis-à-vis a jury comprised of laymen." *Hutchinson* at 233.

In an oral opinion rendered the same day, this Court denied the Respondent's Motion for Separate Trials holding that no prejudice would arise and that a single hearing would save much in the way of time and expense.

Since the charges brought by Bar Counsel against the Respondent arose out of three separate matters, this Court will render both a finding of fact and a conclusion of law as to each.

## PART A

## FINDINGS OF FACT

The Respondent admitted in his Answer to the Petition that prior to 1975, Rudolph Queen, Sr., referred potential clients to him and, in some instances, the Respondent thereafter tendered checks from his bank account to Mr. Queen. Eleven of those checks, drawn on the Respondent's escrow account at the Mercantile-Safe Deposit and Trust Company between May 10, 1974, and December 22, 1975, and ranging in amount from $500.00 to $25.00, were entered into evidence as Petitioner's Exhibit #1.

In his deposition taken on May 2, 1980, the Respondent admitted that, "Yes, I did ask him (Rudolph Queen) to refer clients to me, yes." Deposition at 17.

At the hearing itself, the Respondent freely admitted that the checks in question were given to Rudolph Queen, Sr., for payment of the referral of cases upon the closing of each case. The Respondent further stated that he did not believe Rudolph Queen, Sr., was "soliciting" cases, nor did he believe his payments to Mr. Queen were improper. Earlier in his

testimony the Respondent said that he did not know that it was incorrect to make payments for referrals.

Rudolph Queen, Sr., testified that he referred "maybe 50 or 60 cases" and received money in a "majority" of cases he referred. Mr. Queen stated that while his first payment from the Respondent came in the form of a "gift" from the Respondent, later monies came in the form of cash and checks. Moreover, Mr. Queen testified that at some point in their relationship, the Respondent told him that he would "like to do better by you" and started payment for referrals on a percentage basis. Mr. Queen stated he received "something like 5% of the cases that materialized."

The Respondent acknowledged at the hearing that he now knew that the payments made were improper after "reading the rules closely." Respondent also apologized to the Court for his actions.

## CONCLUSIONS OF LAW

This Court finds by clear and convincing evidence that the payments made by the Respondent to Rudolph Queen, Sr., for the latter's referral of cases is violative of DR 2-103 (C). This Court also finds by clear and convincing evidence that the Respondent's request to Rudolph Queen, Sr., that the latter refer cases is violative of DR 2-103 (D).

Pursuant to the above findings, this Court also finds that the Respondent has violated DR 1-102 (A) (1), and DR 1-102 (A) (6).

## PART B

## FINDINGS OF FACT

The Respondent stated in his Answer to the Petition that on or about April 23, 1973, Steven Queen, the brother of Rudolph Queen, Sr., above-referred to in Part A of the Petition, and Eleanor A. Queen were involved in an automobile collision, as a result of which both were taken to North Arundel Hospital. The Respondent also admitted that Rudolph Queen, Sr., took him to the North Arundel Hos-

pital, introduced him to Steven Queen and recommended his services. (Deposition at 41). Thereafter, the Respondent represented the Queens in their claims arising from said collision.

Steven Queen testified at the hearing that the Respondent told him he "could make some bread under the table" if he referred cases. Eleanor Queen also testified that the Respondent initiated a discussion that led to her being told that she would be paid money if she referred cases to the Respondent. While the Respondent denied initiating any discussion of referrals with either Steven or Eleanor Queen, the Respondent admitted in his Answer to the Petition that he told the Queens he would pay if they did refer cases to him. In fact, after first testifying at the hearing that he had no general discussion of payment for referrals with Eleanor Queen, the Respondent later admitted that he told her that she would be paid if she referred the Abner Stevens case and the Respondent was successful with it. The Respondent then admitted that he paid either Steven or Eleanor Queen for the referral of the Stevens case.

At the hearing, both Steven and Eleanor Queen testified they each referred one case and were compensated for it. Bar Counsel elicited testimony from Steven Queen that he referred a man by the name of Harry Spriggs. Eleanor Queen testified she referred a man by the name of Abner Stevens. Bar Counsel then entered Petitioner's Exhibit Number 7 into evidence, this exhibit being photostatic copies of nine checks. Five of the checks were drawn on the Respondent's Suburban Trust account. The other four were drawn on the Respondent's Mercantile-Safe attorney escrow account. Check number 4642 made out to Eleanor Queen in the amount of $150.00 was clearly identified by Eleanor Queen at the hearing as her compensation for referring Mr. Stevens. Steven Queen testified he received "$40.00 or $50.00 by check" for his referral but could not identify any particular checks in Petitioner's Exhibit #7.

The Respondent also admitted in his Answer to the Petition that he advanced Seven Hundred Twelve Dollars ($712.00) to Steven Queen for purposes other than the

expenses of litigation, expenses of medical examination, and costs of obtaining and presenting evidence. The Respondent also admitted that at the settlement of the automobile collision matter in which he represented the Queens on or about April 24, 1976, the Respondent deducted from the amount due Steven Queen $712.00, the amount of the advances cited above. Testimony at the hearing by both Steven Queen and the Respondent clearly shows that the advances were for food and other necessities of the Queens' home. The Respondent testified that he knew that it was improper for a lawyer to advance funds in this fashion but that he felt sorry for the Queens so he advanced them the money.

Bar Counsel introduced into evidence Petitioner's Exhibits #2 and #3 to show Respondent's full accounting for the loans made to Steven Queen. Petitioner's Exhibit #2 contains four of the Respondent's business cards on the back of which the date and the amount of each loan was recorded along with the signatures of both the Respondent and Steven Queen. The cards are in the amount of $40.00, $200.00, $25.00 and $100.00. The total of the four cards is $365.00. Petitioner's Exhibit #3 is an inter-office memorandum signed by Steven Queen indicating that he owed the Respondent $347.00. The total amount represented by these two exhibits is $712.00, the amount the Respondent admitted loaning Steven Queen for purposes other than the expenses of litigation.

## CONCLUSION OF LAW

This Court finds by clear and convincing evidence that the payments made by the Respondent to Steven Queen and Eleanor Queen for the referral each one made were violative of DR 2-103 (C). This Court also finds by clear and convincing evidence that the Respondent's assertion to the Queens that they would be paid for referring cases was violative of DR 2-103 (D). This Court does not believe it is necessary to choose between the testimony of the Respondent and the Queens as to who initiated the referral

discussions. This Court is satisfied that an expression of the Respondent's willingness to pay for referrals is sufficient to violate DR 2-103 (D).

This Court also finds by clear and convincing evidence that the advances made by the Respondent to Steven Queen were violative of DR 5-103.

Pursuant to the above findings, this Court holds that the Respondent has violated DR 1-102 (A) (1), DR 1-102 (A) (6), and DR 2-103 (D).

## PART C

### FINDING OF FACT

The Respondent admitted in his Answer to the Petition that on or about November 8, 1976, James Edward Harris and Michael Wesley Hughes, passengers in a vehicle owned by one Caroline High, were involved in an automobile collision in Baltimore City. Testimony by both Harris and Hughes at the hearing indicates that immediately after the accident in question, a man named Monroe appeared on the scene driving a black Fleetwood Cadillac. Monroe managed to convince Harris and Hughes that they should consult a lawyer regarding their accident and to allow him to take them to an attorney in his car. After a short stop at another unknown attorney's office — a stop during which Harris and Hughes remained in the car while Monroe went into the building — Monroe took Hughes and Harris to the Respondent's office. At this stop, Monroe remained in the car while Harris and Hughes were in the offices of the Respondent.

Once in the Respondent's office, Harris and Hughes met with Thomas Grzech, a law clerk for Respondent, who took notes regarding the particulars of the accident and who noted that an Earl Williams referred Harris and Hughes to Respondent. On cross-examination, Grzech stated that he wasn't sure if it was Harris or Hughes who gave him Williams' name, but remembered that Williams had referred another case. Exhibit #8. (Although suggested, it is not clear whether Monroe and Williams are one and the

same individual.) Following their meeting with Mr. Grzech, Harris and Hughes returned to the waiting Monroe and had him take them to Provident Hospital for tests.

On November 11, 1976, the Respondent notified Caroline High's insurance carrier, State Farm Insurance, of his representation of Harris and Hughes and requested Personal Injury Protection (PIP) forms, which were subsequently mailed to him. Petitioner's Exhibit #17.

Subsequent to November 11, 1976, according to the testimony of Harris, Hughes and Ms. Elaine Kearny, a State Farm representative, both the Respondent and State Farm were notified by phone by both Harris and Hughes that each wished to drop the case. Despite this information provided by Harris and Hughes, Ms. Kearny testified, she nevertheless proceeded as if the Respondent did in fact represent Harris and Hughes. She explained her actions as being predicated on the fact that while she had a letter from the Respondent indicating his representation of Harris and Hughes, she had no letters either from Harris or Hughes disavowing the Respondent's representation. In essence, she simply ignored both Harris' and Hughes' phone calls with her expressing their desire to drop the case.

On December 6, 1976, notwithstanding both Harris' and Hughes' urgings that he drop the case, the Respondent sent a letter to Ms. Kearny at State Farm enclosing: (1) completed PIP forms for both Harris and Hughes; (2) medical reports from Provident Hospital and Dr. Groll, a physician consulted by Harris and Hughes; and (3) a note from Holiday Inn as to Harris' lost wages. Petitioner's Exhibit #18.

The completed PIP forms cited above, however, were not really complete in that neither Harris nor Hughes actually signed his name on their respective applications. As was explained in the testimony of Sophia Swope, an attorney and ex-wife of the Respondent, and formerly associated with him in the practice of law, it was "office policy" on or about December 6, 1976, to sign the names of the claimants on PIP applications. Ms. Swope testified that Alan Friend, another law clerk for the Respondent, actually signed the names of Harris and Hughes on the PIP applications.

The Respondent admitted in his Answer to the Petition that on or about May 5, 1977, State Farm forwarded two drafts, one payable to Harris, in the amount of $83.20, and one payable to Hughes, in the amount of $109.40 to the Respondent. Ms. Swope further testified that she on or about May 11, 1977, in accordance with office policy, endorsed the said two drafts and deposited them into Engerman's escrow account. At the hearing, the Respondent further explained that the monies from the two drafts were deposited in the escrow account which also contained the Respondent's personal funds. At that time, the Respondent testified, he did not know it was improper to keep personal funds and clients' funds in the same account even though he called the account an "escrow account."

According to testimony given by Harris and Hughes, neither received any funds from the Respondent. However, according to Ms. Swope, the Respondent's office at a later date received a dunning notice from a collection agency, Free State Receivables, Ltd., regarding Hughes' medical bill at Provident Hospital in July, 1978. Furthermore, Ms. Swope testified that she paid Provident Hospital on July 21, 1978, with a check drawn on the Respondent's Escrow Account. Petitioner's Exhibit #30.

The Respondent further explained it was his policy to make certain that medical bills were paid by not relying only on the client's promise to pay after being sent the PIP checks.

## CONCLUSION OF LAW

This Court finds by clear and convincing evidence that the Respondent's failure to maintain separate bank accounts to segregate his personal funds from his clients' funds was violative of DR 9-102.

Despite all the highly suspicious circumstances, this Court cannot find by clear and convincing evidence that the Respondent violated DR 2-103 (D) in his relationship with Mr. Monroe who might also be known as Earl Williams. While the evidence is clear that Williams or Monroe did

refer cases to the Respondent, the evidence did not disclose any request on Respondent's part to Mr. Monroe or Williams or payment to him so as to invoke DR 2-103 (D).

Accordingly, this Court can find no evidence that Respondent violated DR 5-106 in the contention that he made an aggregate settlement of the Hughes and Harris claims. In fact, the evidence is clear that separate PIP payments were received by Defendant's office, although neither Harris nor Hughes received such payments.

Pursuant to the findings cited above, this Court holds that the Respondent violated DR 1-102 (A) (1), DR 1-102 (A) (4) and DR 1-102 (A) (6).

### PERJURY

Since charges brought by the AGC did not specify the complaint of perjury having been committed by Respondent, this Court will not make any findings of fact or conclusions of law with respect to Bar Counsel's oral allegations and contentions at the hearing that the Court should consider same in reference to the disclosure that Respondent had not read the Canons of Professional Ethics prior to filing his application for admission to the Maryland Bar which application contained a certification under oath that he had.

### LACHES

### FINDINGS OF FACT

The chronology of events with regard to the instant matter is as follows:

The initial complaint against the Respondent was filed by Eleanor Queen in April, 1976, in the form of a letter to the Attorney Grievance Commission. On April 26, 1976, Mr. John Addison Howard, Esquire, then the Deputy Bar Counsel at the AGC, was assigned to handle the complaint of Eleanor Queen and Steven Queen, her husband. Also, on April 26, 1976, Mr. Howard wrote to the Respondent, attaching a copy of the Queen complaint and asking for a response. Having received no response from the Respondent,

Mr. Howard wrote a second letter on May 13, 1976, to the Respondent seeking a response to the Queen complaint. On June 16, 1976, Mr. Howard received a letter from Robert E. Cahill, Esquire, on behalf of the Respondent, requesting an extension of time in which to file a response on behalf of his client. On June 17, 1976, Mr. Howard received a second letter from the Queens citing additional complaints against the Respondent. On June 22, 1976, Mr. Howard advised Mr. Cahill of these additional complaints.

Mr. Howard received the Respondent's response on June 28, 1976. On June 30, 1976, Mr. Howard forwarded a copy of the Respondent's response to the Queens to elicit their comments. On July 6, 1976, the Queens met with Mr. Howard, discussed their complaint, and, more importantly, indicated that in addition to the complaints already filed, they had been paid money by the Respondent for the referral of two cases and that Steven Queen's brother, Rudolph Queen, Sr., was the person who had referred their cases to the Respondent.

On July 14, 1976, Mr. Howard forwarded a memorandum to James F. Kennedy, an investigator for the AGC, requesting him to undertake an investigation of the Queens' complaints. On August 5, 1976, Mr. Howard sent a letter to Mr. Cahill advising him that the Queen matter was under investigation by Mr. Kennedy. Mr. Kennedy interviewed the Queens on August 31, 1976, and also interviewed Rudolph Queen, Sr., the brother of Steven Queen, on September 7, 1976.

On November 17, 1976, Mr. Howard presented the matter to the AGC and was authorized to seek immunity for Rudolph Queen, Sr. On January 31, 1977, Mr. Howard, acting with AGC approval upon the information supplied by Mr. Kennedy, sent letters to various officials seeking immunity for Rudolph Queen, Sr., Eleanor Queen and Steven Queen. Returns were received from most of the officials solicited prior to April 15, 1977.

In late March, 1977, information was received by Mr. Kennedy, although not in the form of a written complaint, that the State Farm Insurance Company had paid a claim to

clients of the Respondent in circumstances which had aroused the suspicion of employees of State Farm. Investigation into what eventually became the Harris-Hughes matter was instituted in May, 1977, and completed by November, 1977.

On January 11, 1978, Mr. Kennedy submitted a summary memorandum with regard to all three matters: (1) Rudolph Queen, Sr.; (2) Steven and Eleanor Queen; and (3) Harris-Hughes. Following a long period of intra-office discussions as to what course should be pursued in the Respondent's case, on August 1, 1978, the Steven and Eleanor Queen matter *alone* was referred to the Inquiry Panel of the AGC. Panel members received the file on August 14, 1978.

On September 12, 1978, Robert L. Burckett, Esquire, the Chairman of the Inquiry Panel for the Respondent's matter, requested an extension for the hearing until November 1, 1978. Per an agreement between Mr. Burckett and Mr. Cahill, the matter was rescheduled for early January, 1979.

In early January, 1979, Mr. Howard withdrew from the case. On January 22, 1979, J. Martin McDonough, Esquire, Assistant Bar Counsel at that time, was assigned to handle the Queens' complaint, the matter involving Rudolph Queen, Sr., and the matter involving Harris and Hughes. On January 23, 1979, Mr. McDonough notified Mr. Cahill by telephone of the additional matters (Rudolph Queen, Sr. and Harris-Hughes) and of his intention to present evidence as to all three of these matters to the same Inquiry Panel. After receiving a confirmatory letter from Mr. McDonough on January 29, 1979, Mr. Cahill sought an extension of time in order to prepare to defend against the additional allegations.

The Panel hearing was held on April 27, 1979. The panel submitted its report on June 28, 1979, which was then transmitted to the Review Board. The Review Board directed that charges be filed and their direction was received by the Office of Bar Counsel on December 7, 1979. Charges were filed in the Court of Appeals on January 18, 1980.

## CONCLUSIONS OF LAW

While the facts cited above indicate that the Respondent is correct in asserting that former Bar Counsel had knowledge of all the essential facts alleged in Parts A and B of the Petition as of August 31, 1976, and yet failed to advise the Respondent of the allegations contained in Part A until on or about January 29, 1979, this Court nevertheless finds that the doctrine of laches cannot be a defense to the Respondent and does not apply in this proceeding. This view was clearly stated by the Maryland Court of Appeals in *Anne Arundel Co. Bar Assn. v. Collins,* 272 Md. 578, 583 (1974), which Appellee quoted from the decision of the Supreme Court of Oregon, 459 P. 2d 548 (1969) as follows:

"It is unnecessary to define in this case the proper remedy for vexatious and unreasonable delay on the part of the Bar. None has been shown in this case. It ought to be made clear, however, that the primary purpose of professional disciplinary proceedings is to protect the public. The punishment of an offending member of the profession is indeed a serious matter, but it is incidental to the protection of the public. If the conduct of a member of the Bar disqualifies him from the practice of law, it would not be in the public interest to dismiss the disciplinary proceedings for no reason other than the Bar's failure to prosecute them with the proper dispatch."

Since the purpose of this proceeding is solely to protect the public by determining a lawyer's fitness to practice law, the Respondent is entitled only to a full and fair hearing, not anything more. *Bar Association of Baltimore City v. Posner,* 275 Md. 250, 255 (1975).

In any event, Respondent has failed to show any evidence of prejudice from any delay in commencing disciplinary proceedings. In argument, counsel for Respondent has indicated that a more timely notice of such action would have probably alerted Respondent to his responsibilities as a member of the

Bar and thereby have prevented subsequent alleged infractions or violations of the Disciplinary Rules.

This, of course, is a curious position to take inasmuch as members of the Bar are assumed to know and abide by the Rules and Canons of Ethics respecting the practice of law and lawyers when they enter the practice of law.

Engerman filed exceptions to Judge Sklar's findings of fact and conclusions of law, namely (1) that the court wrongly concluded that the doctrine of laches did not apply in these proceedings, (2) that the court erroneously declined to find that the actions of Bar Counsel in not giving notice to the respondent of the allegations contained in Part A between August 31, 1976 and January 29, 1979 constituted an unreasonable delay in violation of Rule BV6 a 4, and (3) that Judge Sklar was wrong in concluding that the respondent suffered no prejudice as a result of the delay in the commencement of disciplinary proceedings. Additionally, the respondent excepted to Judge Sklar's failure to conclude, in Parts A and B, that his conduct in 1975 and prior thereto "then violated DR2-103 (D), but such conduct would no longer constitute a violation of that Disciplinary Rule in light of the amendment to DR2-101 (A) adopted by the Court of Appeals of Maryland on March 8, 1978." Engerman also excepted, as to Part B, to the court's failure to find as a fact that the payments made by him to either Steven or Eleanor Queen for the referral of the two cases occurred in 1974 or 1975. As to Part C, Engerman excepted to the court's findings (1) "by inference that the actions of the Respondent's employees with respect to obtaining P.I.P. benefits for Harris and Hughes were in contravention of the desire of Harris and Hughes 'to drop the case'" and (2) to Judge Sklar's failure to find that the balance of the P.I.P. benefits remained in the respondent's bank account through the initiation of these proceedings; that they did not inure to the respondent's personal benefit; and that the money was presently in the possession of the respondent's attorney for proper distribution. Finally, as to the court's conclusions of law in Part C, Engerman contends that there was no violation of DR 1-102 (A) (4) "for the reason that the only acts

which would constitute such a violation were performed by the Respondent's employees, without any evidence of direct knowledge or participation by the Respondent."

The Attorney Grievance Commission took exception to Judge Sklar's failure to conclude, as charged in the disciplinary petition, that the respondent also violated DR 1-102 (A) (5) (a lawyer shall not "engage in conduct that is prejudicial to the administration of justice").

We heard oral argument on the exceptions filed by the parties. After careful consideration, we adopt Judge Sklar's findings and conclusions, except that we find that he erred in not concluding that Engerman's conduct, as to Parts A, B and C, also violated DR 1-102 (A) (5).

Considering all the circumstances in the case, we think the appropriate sanction is a 30-day suspension. The suspension of Jay Seth Engerman from the practice of law in this State shall begin thirty days from the date of this opinion. We shall require the respondent to pay all costs of the transcripts prior to the termination of his suspension.

Judge Davidson would have imposed a reprimand only in this case.

> *It is so ordered; respondent shall pay all costs as taxed by the clerk of this Court, including the costs of all transcripts, pursuant to Maryland Rule BV15 c for which sum judgment is entered in favor of the Attorney Grievance Commission against Jay Seth Engerman.*