ATTORNEY GRIEVANCE COMMISSION OF
MARYLAND *v.* WILLIAM H.
PATTISON, JR.

[Misc. (BV) No. 7, September Term, 1981.]

*Decided February 9, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Glenn M. Grossman, Assistant Bar Counsel,* with whom were *Melvin Hirshman, Bar Counsel, Alan D. Krauss* and *Kendall R. Calhoun, Assistant Bar Counsels,* on the brief, for petitioner.

*Joseph F. Lentz, Jr.,* for respondent.

SMITH, J., delivered the opinion of the Court.

Once again we are engaged in the very unpleasant task of disbarring an attorney.[1]

Bar Counsel, acting pursuant to the provisions of Maryland Rule BV9 on behalf of the Attorney Grievance Commission, filed a petition with us seeking disciplinary action against William H. Pattison, Jr., a member of the bar of this Court since November 13, 1952. Two distinct sets of circumstances were involved, one concerning an estate and the other concerning a patent.

### i The estate

Relative to the estate, Bar Counsel alleged a violation of Disciplinary Rule 1-102 (A) (1), (3), (4), (5), and (6); DR 6-101 (A) (1), (2), and (3); DR 9-102 (A) (1) and (2); and DR 9-102 (B) (1), (2), (3), and (4).[2] The trial judge, to whom we referred

---

1. As of the present time there are 12,486 individuals authorized to practice law in Maryland. In 1980 we disbarred seven and suspended two. In 1979 we disbarred nine and suspended two.

As of December 14, 1981, our Clients' Security Trust Fund had $866,737 in assets. This has been built up since July 1, 1966. The initial annual assessment was $15 for attorneys practicing for five years or more and $5 for those practicing less than five years. Some years ago the assessment was reduced to $10 and $3 respectively. The reports of the Trustees of the Clients' Security Trust Fund of the Bar of Maryland on file with this Court show that between July 1, 1966, and June 30, 1981, they paid out a total of $394,859.33 to those who had suffered by defalcations of attorneys. The stated reason for creating the Clients' Security Trust Fund was "for the purposes of maintaining the integrity and protecting the good name of the legal profession by reimbursing, to the extent deemed proper and reasonable by the trustees, losses caused by defalcations of members of the bar of the State of Maryland, acting either as attorneys or as fiduciaries. . . ." Code (1957, 1981 Repl. Vol.) Art. 10, § 43.

We took pains in *Folly Farms I, Inc. v. Trustees,* 282 Md. 659, 680-81 n.4, 387 A.2d 248 (1978), to point out the minuscule number of attorneys engaged in defalcations. We said, "If . . . each claim had involved a different lawyer this would work out to an average of less than .001 of the attorneys in Maryland involved in defalcations each year."

It is never pleasant to disbar or suspend an attorney. The very small number of "rotten apples" in Maryland's "barrel of lawyers" is demonstrated, however, by the above figures relative to our disbarments and suspensions in proportion to the total number of lawyers in Maryland, and the above Clients' Security Trust Fund figures. Our fund was the first compulsory statewide fund. It is one of the largest such funds in the nation, if not the largest.

2. The text of the rules involved is in pertinent part:

"DR 1-102 Misconduct.

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

the matter pursuant to Rule BV9 b, found Pattison violated DR 6-101 (A) (1) and (3), and Code (1957, 1976 Repl. Vol.)

(2) . . .

(3) Engage in illegal conduct involving moral turpitude.

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

"DR 6-101 Failing to Act Competently.

(A) A lawyer shall not:

(1) Handle a legal matter which he knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it.

(2) Handle a legal matter without preparation adequate in the circumstances.

(3) Neglect a legal matter entrusted to him."

"DR 9-102 Preserving Identity of Funds and Property of a Client.

(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

(1) Funds reasonably sufficient to pay bank charges may be deposited therein.

(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

(B) A lawyer shall:

(1) Promptly notify a client of the receipt of his funds, securities, or other properties.

(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

Art. 10, § 44(a), rather than finding that Pattison violated DR 9-102 (A). Bar Counsel excepted, contending that the trial judge was clearly in error when he found no violation of DR 9-102 (A). We agree.

Pattison became the personal representative of the estate of Marie Wanamaker on January 22, 1974. The estate was administered under the jurisdiction of the Orphans' Court of Montgomery County. The trial judge found, "When opened, the Estate contained approximately $30,000.00 in liquid assets, with another $191,000.00 being held in trust in the Commonwealth of Massachusetts by the Massachusetts Hospital Life Insurance Company."

Pattison filed several accounts in the office of the Register of Wills of Montgomery County. None of these accounts is a model of proper estate accounting. In fact, they are sadly deficient.

On February 2, 1979, a hearing was held before Judge Joseph M. Mathias in the Orphans' Court of Montgomery County.[3] The purpose of the hearing was to determine whether the estate could be closed and whether Pattison should continue as personal representative. At the time of that hearing, the attorney who pressed for closing the estate expressed a desire to examine bank statements and checks to ascertain whether all of the cash was in the bank. This

---

Maryland Code (1957, 1981 Repl. Vol.) Art. 10, § 44 (a) states:

"(a) If any attorney is entrusted with, or receives and accepts, or otherwise holds, deposit moneys or other trust moneys, of whatever kind or nature, such moneys, in the absence of written instructions or court order to the contrary shall be expeditiously deposited in an account maintained as a separate account or accounts for funds belonging to others. In no event shall he commingle any such funds with his own or use any such funds for any purpose other than the purpose for which such funds were entrusted to him."

No amendment has been made to that section since its enactment by Ch. 621 of the Acts of 1968.

3. Maryland Constitution art. IV, § 20 (b) provides, "The judges of the Circuit Court for Montgomery and Harford Counties shall each, alternately and in rotation and on schedules to be established by those judges, sit as an Orphans' Court for their County, and shall have and exercise all the power, authority and jurisdiction which the present Orphans' Courts now have and exercise, or which may hereafter be provided by law."

examination took place in Judge Mathias' chambers. Upon the return of Pattison and the attorney to the courtroom, the attorney said:

"I think something has been accomplished. Unfortunately, the primary record which we were interested in, the bank statement, the pass books and bank statements and cancelled checks were not available. They are in — —"

Pattison then said:

"I'm sorry, Your Honor, I didn't realize they were in a safe in my office. My secretary failed to take them out of the safe and put them in the file and I apologize to Mr. Stewart, but I think we have resolved that problem this morning, I hope."

Judge Mathias then passed an order, pursuant to the understanding of the parties, requiring the estate to be closed within twenty days.

On February 16, 1979, Pattison addressed the following letter to Judge Mathias:

"By Order of the Orphan's Court dated February 2, 1979, I, as Personal Representative of the above estate, was directed to complete administration of the estate on or before February 23, 1979. I have progressed with the work necessary to complete administration as directed.

"However, I now realize that it would be inappropriate for me to endeavor to prepare the Final Account and conclude administration for the reason that I earlier borrowed money from the estate assets. The fact that the money has been repaid, with interest, does not cure what I feel to be my disqualification to continue as Personal Representative. Certainly, the Register of Wills and C. Van Leuven Stewart will agree.

"Accordingly, it is the purpose of this letter to request that the Orphan's Court enter such Order as

necessary to remove me as Personal Representative and to appoint a Special Administrator to conclude administration. By this letter I waive requirement of further notice and the right to appear prior to entry of such Order.

"Be assured that I stand ready to cooperate in every possible manner with such Special Administrator as may be appointed.

"A copy of this letter is being forwarded to the Register of Wills, C. Van Leuven Stewart, Esquire, and the Attorney Grievance Commission of Maryland."

Pattison did as he promised. He sent a copy to the Attorney Grievance Commission.

A hearing was held before Judge Mathias on October 15, 1979, in order that Pattison might show cause why he should not be removed as personal representative and, as Judge Mathias put it, "[t]o determine whether or not to hold Mr. Pattison in contempt for his failure to comply with the Court's Order of February 2, 1979."

It developed, as Judge Mathias found and as the trial judge in this case found, that Pattison had paid substantial sums of money from the estate account over to himself. A total of $32,474.55 appears to have been deposited in the estate account at the Maryland National Bank in Cambridge. On January 20, 1975, Pattison drew a check to himself in the amount of $2,000.00. He claims this was an advance on commissions. Before Judge Pollitt, who heard this case under Rule BV9, Pattison said in response to the court's question as to this being an advance against commissions:

"Yes, Your Honor, the first withdrawal I anticipated actually, initially, and erroneously anticipated, substantial commissions in the estate because the estate looked like it would be $225,000/$230, including the trust assets. I anticipated substantial commissions, and the first draw was the basic $2,000 or 10 percent of the first $20,000 allowable commis-

sion, intended to represent that as advance payment." [4]

It developed that the total sum withdrawn by Pattison from the estate was $28,900, being as follows:

| | |
|---|---:|
| 1/20/75 | $ 2,000 |
| 2/28/75 | 500 |
| 4/4/75 | 500 |
| 5/21/75 | 500 |
| 7/3/75 | 2,500 |
| 7/21/75 | 800 |
| 9/5/75 | 400 |
| 9/11/75 | 500 |
| 9/19/75 | 600 |
| 9/19/75 | 200 |
| 12/12/75 | 400 |
| 12/12/75 | 400 |
| 12/12/75 | 100 |
| 12/24/75 | 500 |
| 1/13/76 | 1,000 |
| 1/23/76 | 1,000 |
| 2/23/76 | 500 |
| 3/4/76 | 1,000 |
| 5/12/76 | 1,000 |
| 6/6/76 | 1,000 |
| 9/9/76 | 1,500 |
| 9/28/76 | 1,000 |
| 11/15/76 | 2,000 |
| 12/3/76 | 2,000 |
| 12/17/76 | 2,000 |
| 1/11/77 | 1,500 |
| 4/15/77 | 1,000 |
| 5/6/77 | 1,000 |
| 5/31/77 | 500 |
| 6/16/77 | 1,000 |
| | $ 28,900 |

4. Maryland Code (1957, 1975 Repl. Vol.) Art. 81, § 144 imposes a tax on commissions allowed to personal representatives "equal to (1) one percent

The record further reflects that Pattison deposited the sum of $28,404.65 to the account of the estate at The National Bank of Cambridge on February 8, 1979, six days after the hearing before Judge Mathias.

Pattison seems to have contended throughout this matter that these sums were not peculations on his part, but were loans from the estate to him. Of course, he as personal representative would have had no authority to loan estate money to himself. Judge Mathias removed Pattison as personal representative of the Wanamaker estate, but did not hold him in contempt. The trial judge believed Pattison's statement that he had no intent whatever to deprive the owner permanently of the money involved. He said, "We have not found any 'clear and convincing' evidence to indicate that Respondent harbored any intent to steal the monies or to reduce them to his sole permanent possession," although he did find Pattison's "conduct to be an inexcusable and unjustified breach of his fiduciary obligations to the Estate and a serious invasion of the integrity of the assets of the Estate."

## ii The patent

Pattison is an attorney admitted to practice in the U.S. Patent Office. His activities in the representation of George T. Sendall relative to a patent are the basis for the second set of charges which Bar Counsel brought in the same petition with those charges we have previously discussed. Pattison was alleged to have violated DR 1-102 (A) (1), (3), (4), (5), and (6); DR 6-101 (A) (3), and DR 7-101 (A) (1), (2), and (3).[5] The

---

of the first twenty thousand ($20,000) dollars of the estate plus one fifth of one percent on the balance of the estate, or (2) ten percent of the total commissions allowed, whichever is greater . . . ." Thus, in no event would Pattison have been entitled to receive a net of more than $1,800 on the first $20,000 of the estate. The tax would have been payable to the Register of Wills.

5. The text of the disciplinary rules involved, other than those included in n.2, is as follows:

"DR 6-101 Failing to Act Competently.

(A) A lawyer shall not:

trial judge concluded that Pattison violated DR 6-101 (A) (3) in that he was neglectful.

In that case Pattison was retained to procure a patent for Sendall on what was dubbed the "Mad Baron's Zoaring Zeppelin," a type of kite. The Patent Office ultimately regarded the patent application as abandoned for failure to file proper ink drawings. Pattison was responsible for such filing.

There was clear and convincing evidence to support the conclusion of the trial judge.

### iii Sanction

It is with a heavy heart that one considers the sanction to be imposed upon an attorney who has misused his client's funds. So often attorneys for one reason or another find themselves in a position where the flow of cash in their practice is insufficient to meet office overhead, family needs, and the like. Then comes the temptation to dip into funds which have been entrusted to the attorney, with the thought that the money soon can and will be paid back and the hope

---

(1) . . .

(2) . . .

(3) Neglect a legal matter entrusted to him."

"DR 7-101 Representing a Client Zealously.

(A) A lawyer shall not intentionally:

    (1) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules, except as provided by DR 7-101 (B). A lawyer does not violate this Disciplinary Rule, however, by acceding to reasonable requests of opposing counsel which do not prejudice the rights of his client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.

    (2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2-110, DR 5-102, and DR 5-105.

    (3) Prejudice or damage his client during the course of the professional relationship, except as required under DR 7-102 (B)."

that no one will be the wiser. Often, as here, the peculations grow and grow. It is fundamental that a fiduciary may not make a loan, secured or unsecured (as was this), unto himself.

When called upon at the hearing before the Orphans' Court of Montgomery County in February 1979 to produce the bank records which would substantiate the fact that the estate's assets were properly deposited, Pattison attempted to cover up by blaming his secretary for the fact that the records were not in the file, and suggested that she had failed to take them from the safe. Yet, at that very time, he knew that on thirty occasions he had withdrawn money to the point that the estate's cash assets were nonexistent.

Pattison seeks to distinguish this case from *Bar Ass'n v. Marshall,* 269 Md. 510, 307 A.2d 677 (1973). The only difference we see is that Pattison's case involves much more money. Judge Digges said for the Court in *Marshall:*

"The relationship existing between an attorney and his client is one that of necessity requires mutual trust and confidence. It is of prime importance not only to the parties themselves, but also to lawyers as a group as well as to society in general, that there be no lessening of the degree of confidence that the public has in the fidelity, honesty and integrity of members of the profession. It has been immemorially acknowledged that at the very heart of the attorney-client relationship is the trust concept with the attorney acting as a trustee for his client in all of his undertakings for him. This is especially true in the attorney's handling of moneys of others coming into his hands. So, it is essential that all members of the legal fraternity be strongly and constantly impressed with the truism that in handling moneys and properties belonging to their clients or others that they accept them in trust and are strictly accountable for their conduct in administering that trust, so they dare not appropriate those funds and properties for their personal

use. The misappropriation by an attorney of funds of others entrusted to his care, be the amount small or large, is of great concern and represents the gravest form of professional misconduct. *Balliet v. Balto. Co. Bar Ass'n,* 259 Md. 474, 479, 270 A.2d 465 (1970); *In the Matter of Lombard,* 242 Md. 202, 218 A.2d 208 (1966); *In Re Williams,* 180 Md. 689, 23 A.2d 7 (1941)." 269 Md. at 518-19.

We have said repeatedly that, absent extenuating circumstances, disbarment is the sanction which should be imposed upon an attorney for converting the funds of his client to his own use. This is because, as was said in *Marshall,* an attorney's misappropriation of funds entrusted to his care, be the amount small or large, is of great concern and represents the gravest form of professional misconduct. *See, e.g., Attorney Griev. Comm'n v. Burka,* 292 Md. 221, 438 A.2d 514 (1981); *Attorney Griev. Comm'n v. Micka,* 289 Md. 131, 133, 422 A.2d 383 (1980); *Attorney Griev. Comm'n v. Garson,* 287 Md. 502, 503, 413 A.2d 564 (1980); *Attorney Griev. Comm'n v. McBurney,* 283 Md. 628, 631, 392 A.2d 81 (1978); *Attorney Griev. Comm'n v. Andresen,* 281 Md. 152, 160, 379 A.2d 159 (1977); and *Bar Ass'n of Balto. City v. Carruth,* 271 Md. 720, 727, 319 A.2d 532 (1974). We find no extenuating circumstances here. We have asserted many times that sanctions imposed in disciplinary proceedings against an attorney are not for the purpose of punishing the individual, but are intended as protection to the public. *See, e.g., Attorney Griev. Comm'n v. Engerman,* 289 Md. 330, 346, 424 A.2d 362 (1981); *Attorney Griev. Comm'n v. Kerpelman,* 288 Md. 341, 382, 420 A.2d 940 (1980), *cert. denied,* 450 U.S. 970 (1981); *Attorney Griev. Comm'n v. Lockhart,* 285 Md. 586, 597, 403 A.2d 1241 (1979); *Bar Ass'n of Balto. City v. Posner,* 275 Md. 250, 257, 339 A.2d 657, *cert. denied,* 423 U.S. 1016 (1975); and *Maryland St. Bar Ass'n v. Sugarman,* 273 Md. 306, 316, 329 A.2d 1 (1974), *cert. denied,* 420 U.S. 974 (1975).

Even if Pattison intended to pay back the estate as the trial judge found, in our view the taking of money over the

period of time involved amounted to a misappropriation warranting disbarment.

We desire that the message go out loud and clear to the Maryland Bar and to the citizens of Maryland that we shall not tolerate attorneys' misusing their clients' funds. It follows that the name of William H. Pattison, Jr., shall be stricken from the rolls of those entitled to practice law in this State.

> *It is so ordered; respondent shall pay all costs as taxed by the Clerk of this Court, including the costs of transcripts, pursuant to Maryland Rule BV15 c for which sum judgment is entered in favor of the Attorney Grievance Commission against William H. Pattison, Jr.*