469 A.2d 853

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Robert Carroll MORRIS IV.

Misc. (BV) No. 7, Sept. Term, 1983.

Court of Appeals of Maryland.

Jan. 11, 1984.

Walter D. Murphy, Jr., Asst. Bar Counsel, Annapolis (Melvin Hirshman, Bar Counsel, Annapolis, on petition), for petitioner.

Joseph M. Bryan, Greenbelt, and Robert Carroll Morris IV, Beltsville, in pro. per.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

PER CURIAM.

Bar Counsel, acting pursuant to the provisions of Maryland Rule BV9, filed a petition with us on behalf of the Attorney Grievance Commission seeking disciplinary action against Robert Carroll Morris IV, a member of the Bar of this Court. The petition alleged a violation of the Disciplinary Rules in connection with Morris' representation of Addie Louise Martin in an automobile accident case and a violation of the Disciplinary Rules in connection with his representation of the estate of Wilbur Max Poynton.

Pursuant to Rule BV9 b we referred the matter for hearing to one of the judges of the Seventh Judicial Circuit of Maryland. He has filed with us a report which states:

## "FINDINGS OF FACT

### "ADDIE LOUISE MARTIN

"Addie Louise Martin (hereinafter referred to as 'Mrs. Martin') was injured in an automobile accident on November 16, 1978, in Prince George's County. On that day, Mrs. Martin hired the Respondent to represent her in her claims for personal injuries and property damage resulting from that accident. Under the contract of employment between Mrs. Martin and the Respondent, the Respondent agreed to handle Mrs. Martin's case for a contingency fee of one-third (⅓) of the amount recovered, the remainder to go to the client. In addition, Mrs. Martin agreed to be responsible for costs and expenses.

"The Respondent filed suit in the District Court of Maryland on behalf of Mrs. Martin against Christopher Lockwood and John Lockwood, Sr. The Defendants in that case were represented by Edward C. Bell, Esquire, who caused the said case to be removed to the Circuit Court for Prince George's County as a result of his request for jury trial. Trial was set for August 12, 1980; however, because no judge was available to hear the case, it was postponed. (*Martin v. Lockwood*, Law No. 76,921).

"During a pre-trial conference in December, 1980, before the Honorable Vincent J. Femia, of the Circuit Court for Prince George's County, the Respondent stated to Mr. Bell and to Judge Femia that he proposed to introduce into evidence medical bills even though the Respondent admitted at that time that he had no evidence that the said medical bills were made necessary because of the occurrence (with the hope that the jury would keep one or more of them in mind when assessing damages).

"On the evening of July 16, 1981, at the restaurant, the Respondent met, for the first time, Carl H. Hellmann. The two were introduced to each other by a mutual acquaintance. During their conversation after their introduction, Hellmann learned that the Respondent was an attorney and the conversation turned to the case of *Martin v. Lockwood, supra.* The Respondent invited Hellmann to help out with the case. Hellmann knew that the Respondent was the attorney for Mrs. Martin and that his services were necessary for the presentation of Mrs. Martin's case. Hellmann has taken a number of courses at the post-graduate level, but is not a college graduate. He has some experience in investigating traffic accidents and testifying as an expert witness. Hellmann quoted a fee range of between $50.00 to $150.00 per hour and $500.00 per day in court, plus expenses. Hellmann did tell the Respondent, however, that sometimes his fee could be as high as $300.00 per hour. In any event, the Respondent requested Hellmann at their first meeting on July 16, 1981, to assist in the preparation of Mrs. Martin's case. Hellmann and the Respondent never agreed upon an amount or method of compensation. Further, the Respondent did not personally guarantee the payment of Mr. Hellmann's fee. Hellmann stayed up all night reviewing the Respondent's file on that case and preparing a preliminary typewritten report, which he completed at approximately 7:00 a.m. on July 17, 1981. On the morning of July 17, 1981, Hellmann accompanied the Respondent to a settlement conference before the Honorable Jacob S. Levin. Hellmann gave the Respondent his preliminary report. Hellmann val-

ued his work on this preliminary report at $1,000.00, but he testified that he wrote it off. He did, however, accept a cash retainer fee of $100.00 on the morning of July 17, 1981, from the Respondent.

"The trial of *Martin v. Lockwood* commenced on July 27, 1981, before the Honorable James H. Taylor and a jury, and concluded on July 20, 1981 [sic]. The ultimate verdict in the case was a judgment for Mrs. Martin in the amount of $4,000.00, after a remittitur was entered. Mrs. Martin never endorsed that check. Her signature was placed on the check by an employee of the Respondent, although the Respondent knew of that fact after the endorsement and did nothing to correct it, he did not participate directly in the forgery. In August or September, 1981, the Respondent misrepresented to his client, Mrs. Martin, that he had placed the proceeds of the GEICO draft into an escrow account, when in fact he had not.

"The Respondent's Inquiry Panel hearing on these matters was held on September 17, 1982, in the law offices of Darlene G. Perry, Esquire. On that same day, an account was opened up at People's Security Bank of Maryland in the Respondent's name, account number 64–4241–7, with an initial deposit of $4,000.00. The $4,000.00 with which this account at People's Security Bank was opened was not the same $4,000.00 fund which the Respondent had received from GEICO as documented by Petitioner's Exhibit No. 6, back on August 14, 1981. (Paragraph 2(c) of Petitioner's Exhibit No. 2). The Respondent testified that he did not know whose money was used to open the said account at People's Security Bank of Maryland on September 17, 1982.

## "CONCLUSIONS OF LAW

"1. By misappropriating and converting to his own use the $4,000.00 recovery in the case of *Martin v. Lockwood* between August 14, 1981 and September 1, 1982, the Respondent violated Disciplinary Rules 1–102 (A) (1), (3), (4), (5) & (6); 9–102(A) & (B); as well as Article 10, Section 44 of the

Annotated Code of Maryland. See *Bar Association of Baltimore City vs. Marshall,* 269 Md. 510, 307 A.2d 677 (1973), *Attorney Grievance Commission v. Bailey,* 294 Md. 526, 451 A.2d 1210 (1982), *Attorney Grievance Commission v. Flynn,* 283 Md. 41, 387 A.2d 775 (1978), and *Attorney Grievance Commission v. Boehm,* 293 Md. 476, 446 A.2d 52 (1982).

"2. By misrepresenting to his client, Mrs. Martin, that he had placed the $4,000.00 fund which he had received from GEICO (Petitioner's Exhibit No. 6) into an escrow account, when in fact he had not, the Respondent violated Disciplinary Rule 1–102(A)(4).

### "FINDINGS OF FACT

### "WILMA BRIGGLES

"In October, 1980, the Respondent wrote the will of Wilbur M. Poynton, who subsequently died on January 14, 1981. The will was admitted to probate by Wilma Briggles, one of two surviving children of Wilbur Max Poynton. The decedent's other surviving child was Roy Max Poynton, the brother of Wilma Briggles. The will required the decedent's property to be divided evenly between those two surviving children.

"Specifically, Wilma Briggles did the following on January 16, 1981, in the Orphans' Court for Prince George's County:

"1. Filed the Last Will and Testament.

"2. Filed the Petition for Probate.

"3. Filed the Acceptance and Consent of the Personal Representative.

"4. Filed a nominal bond.

"5. Obtained an Order admitting the will to probate.

"6. Obtained letters testamentary.

"7. Made arrangements for the notice to creditors.

"By letter dated February 2, 1981, the Respondent advised Wilma Briggles that he had set Friday, February 6, 1981, at 4:30 p.m., in his office for the reading of her father's will.

Wilma Briggles did in fact appear in the Respondent's office on February 6, 1981, at which time she hired the Respondent to represent her as the Personal Representative and/or to represent the estate of Wilbur M. Poynton. The Respondent requested and received a fee of $500.00 at that meeting from Wilma Briggles, who wrote a check payable to the Respondent in that amount from the estate checking account. At that meeting, the Respondent advised her to stop making the mortgage payments on the house where the decedent had lived up until his death. The house was the only major asset in the estate and Perpetual American Federal Savings and Loan Association held a first deed of trust on the said property, which, at that time, had a total balance in excess of $3,500.00. Wilma Briggles made no further payments.

"The Respondent did not file anything in the said estate until November 4, 1981, when he filed an Inventory along with a notation entering his appearance. In the interim, Wilma Briggles had filed the Information Report herself on June 15, 1981. On May 13, 1981, the Register of Wills sent Wilma Briggles a notice that the Inventory and Information Report for the estate were overdue and requested that they be filed by June 12, 1981. (See Petitioner's Exhibit No. 26).

"In February, 1981, the Respondent contacted Prince George's Properties with regard to listing the house for sale. As a result, a listing contract was entered into between Wilma Briggles and Prince George's Properties, dated February 17, 1981. A contract offer, dated March 8, 1981, was submitted to Wilma Briggles under that listing agreement by Osbourne Owings. The purchase price of the offer was $30,000.00, later reduced to $29,100.00, as a result of a counter-offer. As soon as she received this contract, Wilma Briggles gave it to the Respondent and asked him for his advice as to what to do with it. The Respondent failed to give Wilma Briggles any advice on the said contract through early May, 1981. Mr. Petroni and Mr. Woodring of Prince George's Properties had a meeting with the Respondent on this contract in early June, 1981, at which time the Respondent advised them that he would recommend to his client,

Wilma Briggles, that the contract be accepted. However, at about the same time, the Respondent told Wilma Briggles not to accept the contract and that his father or he, himself, would purchase the house. Mr. Woodring and Mr. Petroni left the said meeting believing that the said contract was going to be accepted as a result of the representations which the Respondent made to them. However, the Respondent then wrote to Osbourne Owings, by his letter dated June 24, 1981 to formally withdraw his client's contract, stating, in part, that it was unfortunate that the offer and counter-offer were never accepted. Osbourne Owings was ready, willing and able to purchase the said property between March and June of 1981.

"Wilma Briggles and her brother, Max Poynton, sold the house for $24,000.00 on November 6, 1981, to Leroy J. Daniels and took back, as part of the purchase price, an interest-free five year note in the amount of $14,900.00 with no provision for any monthly payments. The Respondent did not attend that settlement, nor did he aid Wilma Briggles in any way with respect to that transaction.

"Wilma Briggles testified that on December 28, 1981, she wrote the Respondent and discharged him as her attorney. However, the Respondent never did withdraw his appearance in the Orphans' Court case after that date. The Respondent replied to Wilma Briggles' December 28, 1981 letter with his letter dated January 6, 1982, which is also his bill to Wilma Briggles as Personal Representative of the estate, showing a total balance due of $1,845.00. The bill falsely indicated that he had obtained an Order admitting the will to probate, obtained testimony of subscribing witnesses, obtained a certificate of proof of will, obtained letters testamentary and handled the publication of notice to creditors and prepared a preliminary estate tax report. In addition, the Respondent included a bill for preparation of the Inventory twice under paragraph 1 and paragraph 8 of the said bill. The bill also includes items for two loans of $100.00 to Max Poynton. The bill also contains charges for

services to Wilma Briggles' son, George Briggles, in the total amount of $500.00, which did not pertain to the estate.

"Wilma Briggles challenged the Respondent's bill and a hearing was held on counsel fees before the Honorable Steven I. Platt, on March 5, 1982. During the course of that hearing, the Respondent was discourteous to Judge Platt in that he made comments on the way he ran his courtroom, interrupted Judge Platt and misrepresented on the record what Judge Platt had stated during that hearing. As a result of the Respondent's conduct at that hearing, Judge Platt recused himself, and the hearing on counsel fees was continued.

"On April 1, 1982, the Respondent filed his Petition for the Allowance of Counsel Fees in the estate. Thereafter, the matter was heard by Judge C. Philip Nichols, Jr. At the hearing on April 16, 1982, the Respondent misrepresented to Judge Nichols that the $500.00 fee which Wilma Briggles had paid him in the Orphans' Court matter was for other matters as well. In fact, Wilma Briggles had paid the Respondent a separate fee of $500.00 from her credit union to handle her domestic case. This payment was also made in February of 1981, but was entirely separate from the other fee which was paid from the estate checking account. In addition, at that hearing, the Respondent attempted to obtain reimbursement, in the form of a fee from the estate, of two $100.00 loans to Max Poynton, as well as compensation for time spent responding to the Attorney Grievance Commission regarding Max Poynton's complaint.

## "CONCLUSIONS OF LAW

"1. By failing to enter his appearance or to file anything in the Orphans' Court file of Wilbur Max Poynton until November 4, 1981, while, among other things, his client was being notified that the Inventory and Information Report were overdue, and by failing to pursue the March 8, 1981 contract with Osbourne Owings, the Respondent violated

Disciplinary Rules 1–102(A)(1), (5) & (6); 6–101 (A), (2) & (3), and 7–101 (A) (1), (2) & (3).

"2. By proposing himself and/or his father as possible buyers for the subject home, and by, at about the same time, rejecting the outstanding offer of Osbourne Owings, the Respondent violated Disciplinary Rule 5–101(A).

"3. By drafting and having Max Poynton sign and then by submitting the Request for Withdrawal of Complaint to the Attorney Grievance Commission, the Respondent violated Disciplinary Rules 1–102(A) (5) & (6).

"4. By billing $1,845.00 to the estate, the Respondent charged a clearly excessive fee in violation of Disciplinary Rule 2–106.

"5. The Respondent violated Disciplinary Rule 2–110(B)(4) by failing to withdraw from the Orphans' Court case after he was discharged by Wilma Briggles per her letter of December 28, 1981.

"6. By misrepresenting on his bill the work which he had done on the estate, i.e., listing things which Wilma Briggles herself had done even before he was hired as the attorney, the Respondent violated Disciplinary Rules 1–102(A)(1), (4), (5), & (6) and 2–106.

"7. By attempting to bill for the estate for services rendered to George V. Briggles, son of Wilma Briggles, which services had nothing to do with the estate and by attempting to secure the payment with confession of judgment notes payable from the estate, the Respondent violated Disciplinary Rules 1–102(A)(1), (4), (5) & (6); 2–106; 7–101(A)(3); and 7–101(A)(2). See also *Riddleberger v. Goeller,* 263 Md. 44, 282 A.2d 101 (1971) and *Gradman v. Brown,* 183 Md. 634, 39 A.2d 808 (1944).

"8. By engaging in undignified and discourteous conduct before Judge Platt, by his misrepresentations and by commenting on the way Judge Platt ran his courtroom, as a result of which Judge Platt recused himself, the Respondent violated Disciplinary Rules 1–102(A)(1), (4), (5) & (6); and 7–106(C)(6) & (7).

"9. By misrepresenting to Judge Nichols on April 16, 1982 that the $500.00 fee which he had received from Wilma Briggles on February 6, 1981 was for other matters, the Respondent violated Disciplinary Rules 1–102(A)(1), (4), (5) & (6).

"10. By attempting to obtain reimbursement of two $100.00 loans to Max Poynton before the Honorable Philip C. Nichols, Jr., on April 16, 1982, and for the time spent responding to the Attorney Grievance Commission, the Respondent violated Disciplinary Rules 1–102(A)(1), (5) & (6); and 2–106."

Morris has filed no exceptions. He did appear before us with counsel. He and counsel spoke of the fact that Morris intended no wrongdoing and pleaded for leniency. Bar Counsel, on the other hand, has recommended disbarment.

Although no exceptions were filed, we have meticulously examined the record in this case. There is clear and convincing evidence to support the findings of fact of the trial judge. Those findings warrant his conclusions of law.

No extenuating circumstances for Morris' misconduct have been set forth, nor do we find any. Under the sum total of the circumstances here, disbarment is the proper sanction to be imposed.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15 c, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST ROBERT CARROLL MORRIS IV.