475 A.2d 466

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

**v.**

**Charles P. HOWARD, Jr.**

**Misc. (Subtitle BV) No. 4, Sept. Term, 1983.**

Court of Appeals of Maryland.

June 1, 1984.

Charles P. Howard, Jr., Baltimore, respondent.

Glenn M. Grossman, Asst. Bar Counsel, Annapolis (Melvin Hirshman, Bar Counsel, Annapolis, on the petition), for petitioner.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

DAVIDSON, Judge.

The Attorney Grievance Commission (Commission) through Bar Counsel filed a petition for disciplinary action against the respondent, Charles P. Howard, Jr. (Howard), alleging violations of the Disciplinary Rules of the Code of Professional Responsibility. Pursuant to Maryland Rule BV 9 b, this Court referred the matter to Judge Marshall A.

Levin of the Eighth Judicial Circuit. On 13 September 1983, after an evidentiary hearing, the hearing judge filed a written memorandum of findings of facts and determinations, which is attached as an appendix to this opinion. These findings and determinations may be summarized as follows:

On 25 April 1978, Stanley L. Jefferson (Jefferson) was involved in an automobile accident. On or about 26 April 1978, Jefferson retained Howard to represent him on a contingency fee basis. On 18 January 1979, Howard filed a personal injury action against Jocelyn T. Mack and Milton Mack, Jr. (Mack case). On 15 February 1979, service was returned "non-est." Howard took no further action because of alleged difficulties with Jefferson. The Mack case was never settled.

The hearing judge concluded that, as a result of this conduct, Howard had violated the following Disciplinary Rules of the Code of Professional Responsibility: DR 6–101(A)(3);[1] DR 7–101(A)(2) and (3).[2]

On 26 May 1978, Jefferson was involved in another automobile accident. On or about 7 June 1978, Jefferson retained Howard to represent him on a contingency fee basis. On 12 January 1979, Howard filed a personal injury action against Beverly Jones and Jarrett Seymore Davis (Jones case) and service was obtained.

In the Jones case, Jefferson had incurred medical bills in the amount of approximately $537.70. Howard received

---

1. DR 6–101(A)(3) provides:
    "(A) A lawyer shall not:
    *       *       *       *       *       *
    "(3) Neglect a legal matter entrusted to him."
2. DR 7–101(A)(2) and (3) provides in pertinent part:
    "(A) A lawyer shall not intentionally:
    .       .       .       .
    "(2) Fail to carry out a contract of employment entered into with a client for professional services...."
    "(3) Prejudice or damage his client during the course of the professional relationship...."

Personal Injury Protection (PIP) benefits on behalf of Jefferson in the approximate amount of $537.70. This money was not deposited in an identifiable bank account.

Howard distributed one-third of the PIP benefits to Jefferson and retained the remaining two-thirds. Subsequently, Jefferson returned his one-third of the PIP benefits to Howard, who failed to keep any records of this transaction. Although Howard had assured Jefferson that he would pay Jefferson's medical bills, at the time of the hearing, those bills were not paid.

The hearing judge concluded that, as a result of this conduct, Howard had violated Maryland Code (1957, 1981 Repl.Vol., 1983 Cum.Supp.), Art. 10, § 44,[3] and the following Disciplinary Rules of the Code of Professional Responsibility: DR 1–102(A)(3), (4), (5) and (6);[4] DR 7–101(A)(1);[5] DR 7–102(A)(8);[6] DR 9–102(A);[7] DR 9–102(B)(3) and (4).[8]

---

**3.** Art. 10, § 44 provides in pertinent part:

"(a)(1) If any attorney is entrusted with, or receives and accepts, or otherwise holds, deposit moneys or other trust moneys, of whatever kind or nature, such moneys, in the absence of court order to the contrary shall be expeditiously deposited in an account or accounts maintained as a separate account or accounts for funds belonging to others. In no event shall the attorney commingle any such funds with such attorney's funds or use any such funds for any purpose other than the purpose for which they were entrusted to the attorney."

**4.** DR 1–102(A)(3), (4), (5) and (6) provides:

"(A) A lawyer shall not:

"(3) Engage in illegal conduct involving moral turpitude.

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

"(5) Engage in conduct that is prejudicial to the administration of justice.

"(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

**5.** DR 7–101(A)(1) provides in pertinent part:

"(A) A lawyer shall not intentionally:

"(1) Fail to seek the lawful objectives of his client through reasonably available means. . . ."

**6.** DR 7–102(A)(8) provides:

"(A) In his representation of a client, a lawyer shall not:

---

**7.** See note 7 on page 735.

**8.** See note 8 on page 735.

On several occasions, Jefferson attempted to terminate Howard's services in both the Mack and Jones cases. Although Jefferson indicated that he would reimburse Howard for expenses, Howard refused to withdraw unless and until he was paid a fee.

The hearing judge concluded that, as a result of this conduct, Howard had violated Disciplinary Rule 2–110(B)(4)[9] of the Code of Professional Responsibility.

On or about 29 June 1981, Howard suggested that Jefferson write a letter to the Commission indicating that he was satisfied with Howard's services and that he no longer wished to press charges. Howard represented to Jefferson that if he wanted to get the Mack case settled, "I [Jefferson] had to get the [Commission] off of his [Howard's] back." On 29 June 1981, Jefferson sent such a letter to the Commission because he believed it would be the only way that he could get the Mack case settled.

---

> . . . . . .
> "(8) Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule."

7. DR 9–102(A) provides in pertinent part:
   > "(A) All funds of clients paid to a lawyer or a law firm ... shall be deposited in one or more identifiable bank accounts ... and no funds belonging to the lawyer or law firm shall be deposited therein...."

8. DR 9–102(B)(3) and (4) provides:
   > "(B) A lawyer shall:
   >
   > . . . . . .
   > "(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.
   > "(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

9. DR 2–110(B)(4) provides in pertinent part:
   > "(B) Mandatory withdrawal.
   > A lawyer representing a client before a tribunal ... shall withdraw from employment ... if:
   >
   > . . . . . .
   > "(4) He is discharged by his client."

The hearing judge concluded that, as a result of this conduct, Howard had violated the following Disciplinary Rules of the Code of Professional Responsibility: DR 1–102(A)(4), (5) and (6); DR 6–102(A).[10]

Howard excepted to all of the hearing judge's findings of facts and conclusions of law other than the finding in the Jones case that he failed to timely pay a medical bill. Howard recommended that the appropriate sanction be a reprimand. The Commission recommended the sanction of disbarment.

We have made an independent review of the record and have concluded that the hearing judge's findings of facts are supported by clear and convincing evidence. *Attorney Grievance Comm'n v. Morris,* 298 Md. 299, 308, 469 A.2d 853, 857 (1984); *Attorney Grievance Comm'n v. Stancil,* 296 Md. 325, 330–31, 463 A.2d 789, 791 (1983). Accordingly, we adopt those findings of fact. Additionally, we adopt the hearing judge's conclusions that Howard violated Md.Code, Art. 10, § 44; DR 1–102(A)(3), (4), (5) and (6); DR 2–110(B)(4); DR 6–101(A)(3); DR 6–102(A); DR 7–101(A)(1), (2) and (3); DR 7–102(A)(8); DR 9–102(A); and DR 9–102(B)(3) and (4).

█ The only remaining question is the appropriate sanction to be imposed. The severity of the sanction to be imposed for misconduct generally depends upon the facts and circumstances of the case. *Stancil,* 296 Md. at 331, 463 A.2d at 791; *Attorney Grievance Comm'n v. Pollack,* 289 Md. 603, 609, 425 A.2d 1352, 1355 (1981).

This Court has previously determined that, absent extenuating circumstances, misappropriation of funds entrusted to a lawyer's care ordinarily warrants disbarment. *Attorney Grievance Comm'n v. Boehm,* 293 Md. 476, 481, 446 A.2d 52, 54 (1982); *Attorney Grievance Comm'n v. Pattison,*

---

**10.** DR 6–102(A) provides:

"(A) A lawyer shall not attempt to exonerate himself from or limit his liability to his client for his personal malpractice."

292 Md. 599, 609, 441 A.2d 328, 333 (1982); *Bar Ass'n of Baltimore City v. Marshall,* 269 Md. 510, 520, 307 A.2d 677, 682 (1973). Additionally, this Court has previously recognized that, in determining the degree of discipline to be imposed, it is proper not only to consider extenuating circumstances, but also an attorney's prior history of misconduct and any antecedent sanctions that may have been imposed. *Attorney Grievance Comm'n v. Stewart,* 285 Md. 251, 261, 401 A.2d 1026, 1031, *cert. denied,* 444 U.S. 845, 100 S.Ct. 89, 62 L.Ed.2d 58 (1979); *Maryland State Bar Ass'n v. Phoebus,* 276 Md. 353, 361, 347 A.2d 556, 560 (1975).

Here there was evidence to show that Howard had practiced law in Maryland for approximately 28 years, and that the disciplinary rules violations in this case arose from a difficult relationship with a single client. Nevertheless, Howard misappropriated a client's funds and, among other things, neglected a legal matter, commingled funds, failed to keep records, and engaged in conduct prejudicial to the administration of justice. No extenuating circumstances were presented.

Moreover, this is not the first occasion upon which Howard has engaged in misconduct warranting the imposition of a sanction. As recently as 1978, in *Attorney Grievance Comm'n v. Howard,* 282 Md. 515, 385 A.2d 1191 (1978),[11] this Court found that Howard had twice neglected legal matters and thereby violated DR 6–101(A)(3), initially by failing to be present for trial when a case was called, and

---

11. We note that on 8 April 1983, the Commission served interrogatories on Howard in which Question 7 asked, in essence, whether Howard had ever been disciplined for professional misconduct. Howard responded that he was unable to answer that question. The Commission filed an exception. On 3 June 1983, after a hearing, the hearing judge sustained the Commission's exception "upon the condition" that Howard need not answer Question 7 "unless and until he has been found by this Court to have violated a Disciplinary Rule of the Code of Professional Responsibility." The record indicates that Howard did not answer Question 7, even after the hearing judge found violations of the Disciplinary Rules.

then by failing to file a brief in another case. Additionally, this Court found that Howard had violated DR 7–106(C)(6) [12] of the Code of Professional Responsibility by failing, on three different occasions, to be present when a case was called. Recognizing that, should there be further misconduct on Howard's part, the sanction imposed in that proceeding could form a more severe sanction in the future, this Court determined that the appropriate sanction to be imposed was a reprimand. *Howard,* 282 Md. at 524, 385 A.2d at 1196.

Howard's present misconduct, coupled with his prior misconduct, warrants the sanction of disbarment. Accordingly, the name of respondent, Charles P. Howard, Jr., shall be stricken from the rolls of those authorized to practice law in this State.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV 15 c, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST CHARLES P. HOWARD, JR.

APPENDIX *

FINDINGS OF FACT AND DETERMINATIONS

## I. THE CHARGES

On April 4, 1983, the Attorney Grievance Commission of Maryland (AGC) by its Bar Counsel (BC) petitioned the

---

12. DR 7–106(C)(6) provides:
    "(C) In appearing in his professional capacity before a tribunal, a lawyer shall not:

    .     .     .     .     .

    "(6) Engage in undignified or discourteous conduct which is degrading to a tribunal."

* In reproducing Judge Levin's written Memorandum of Findings of Fact and Determinations, citations to the record and internal cross-references within the Memorandum have been eliminated and footnotes have been renumbered.

Court of Appeals (by petition filed on April 8, 1983), to take appropriate disciplinary action against the Respondent. It asserted that the Respondent had engaged in certain misconduct [1] with respect to his legal representation of his then client, one Stanley Jefferson (Jefferson), in connection with two automobile accidents, one which had occurred on April 26, 1978 (First Case) and the other on May 26, 1978 (Second case).

In particular, it averred that as concerns the First Case, the Respondent had filed suit against the Defendants [2] on January 18, 1979 but took no substantive action on Jefferson's behalf thereafter, failed to perfect service, and, after Jefferson terminated Respondent's services as his counsel in December 1979, refused to withdraw from the case and refused to make his files (in the two cases) available absent payment of an exorbitant sum, i.e., $750.

As to the Second Case, Bar Counsel averred that the Respondent filed suit [3] on January 12, 1979 on behalf of Jefferson, who had sustained personal injury which resulted in a hospital bill of $107.70 [4] and a doctor's bill in the amount of $430.[5] It asserted that the Respondent received Personal Injury Protection (PIP) benefits of $537.70 on behalf of Jefferson but that he misappropriated part or all of these funds to his own use. It claimed that the Respondent represented to Jefferson that one-third of the PIP would be used for payment of medical expenses, one-third would be given to Jefferson, and one-third represented the Respondents fee; but it also charged that the doctor and

---

1. As defined by Rule BV1(j) of the Maryland Rules of Procedure.

2. Jocelyn T. Mack and Milton Mack, Jr.—in the District Court of Maryland for the City of Baltimore.

3. Against Beverly Jones and Jarrett Seymore Davis—in the District Court of Maryland for the City of Baltimore.

4. Mercy Hospital in Baltimore.

5. Dr. E.E. Holt of Baltimore, Maryland.

hospital bills had never been paid and that Jefferson had returned $179.23 (originally given to him by the Respondent) to the Respondent within a very short time in protest of the Respondents division of the funds.

It further asserted that Jefferson terminated the Respondent's services in December 1979, but that the Respondent refused to withdraw and refiled suit in the Second Case in the Court of Common Pleas [6] and later settled that case for $1,500. It claims that the Respondent paid to Jefferson $670.77 in settlement, but that said sum was less than the amount to which Jefferson was entitled and that the Respondent converted to his own use the difference between the amount to which Jefferson was entitled plus $670.77.

Finally, it charged that Jefferson filed charges against the Respondent but that the Respondent required Jefferson to draft a document stating that Jefferson would take no further action against the Respondent in connection with the above matters. Further that the Respondent sought to thwart the investigation of his conduct by the Inquiry Panel [7] by refusing to produce his files in connection with these cases despite proper summons.

As the result, BC charged the Respondent with violation of various Disciplinary Rules (DRs) and Art. 10, Sec. 44 of the Annotated Code of Maryland. The Court of Appeals, by Order dated April 6, 1983, transmitted said charges to the Circuit Court for Baltimore City [8] to be "heard and determined" by the undersigned.

The Respondent denied the essential allegations.

The parties engaged in various pre-trial discovery and on July 6, 1983, a hearing was held on said charges.

---

6. Dkt. 1979, folio 147, file 20587, 8.

7. Which held hearings on November 4th and 18th, 1982.

8. In accordance with Maryland Rule BV9, *et seq.*

## II. THE PROCEEDINGS
### A. SECOND CASE

BC presented two witnesses: the treating physician, Dr. Edward E. Holt and Jefferson.

Dr. Holt testified that he treated Jefferson for the Second Case, charged him $430 therefor, but had never been paid. He was aware that Jefferson was represented by the Respondent at the time he was seen by Jefferson. Respondent asked no questions of the doctor.

It is undisputed that the Respondent was retained by Jefferson to pursue his claims in connection with the two automobile accidents, that, as to the Second Case, the Respondent requested PIP on behalf of Jefferson in the amount of $537.70, that Jefferson incurred Dr. Holt's bill for $430 and Mercy Hospital's bill for $107.70 (and that said bills were included in the Respondents files) and that the Respondent received PIP benefits in the amount of $527.70 on February 22, 1979. It is further undisputed that the Respondent received a draft for $1,500 on January 23, 1981 for settlement of the Second Case and distributed it as follows:

| | |
|---|---|
| Attorney Fee | $500.00 |
| Filing Fee | 29.00 |
| Driving Record | 1.00 |
| Private Process Server | 40.00 |
| Filing Fee | 55.00 |
| Final Court Costs | 15.00 |
| Hospital Report | 10.00 |
| "Net Settlement to Client $850 | |
| Less payment to Mr. Jefferson | |
| (February 22, 1979) $179.23" | $670.77 |

As concerns the settlement check Respondent contends that he paid Jefferson the $670.77 in cash on March 12, 1981; and as to PIP, the Respondent claims he paid the $179.23 to Jefferson also in cash. He maintained no bank account for Jefferson "as there was no need."

The Respondent admitted that the hospital bill was never paid, although Jefferson testified that the Respondent told him that "the hospital bills were being paid" when the

Respondent explained the $1,500 settlement with him. As to the doctor bill, the Respondent claimed that Dr. Holt was his (Respondent's) client and had agreed that the Respondent could set off "a part of the money" due him from Jefferson and further, that he (Respondent) had paid $100 to Dr. Holt on February 23, 1979.

With respect to PIP, the Respondent testified that he had an agreement with Jefferson that he (Respondent) was to receive ⅓ of the PIP money.

Jefferson testified, as concerns the Second Case, that he and Clarence Bowman were among the passengers in an automobile driven by one Mr. Spell and that following the accident, all three were represented by the Respondent. Ultimately, the Respondent "split (the PIP) in thirds, ⅓ for Dr. Holt, himself and ⅓ for me" but by that time Jefferson was not satisfied with the Respondent's service and did not trust him at that point. He wanted to give Respondent all of the PIP money back "so that when the case got settled, I could see everything at one time and know that I was being treated fairly." Accordingly, he obtained a money order in the amount of $178.23 in his own name and "signed it over" to the Respondent.[9]

Jefferson testified that he had also been involved as a passenger in the first accident with Spell also being the driver. So at the time of Jefferson's disenchantment with the Respondent (approximately the last part of 1979 or the first part of 1980) he told Respondent that he was not satisfied with his services, did not think Respondent was working in his best interests and wanted to change attorneys. He further told the Respondent that he would tell the new attorney to give the Respondent his (Respondent's) money first "before anything was received by myself" but Respondent said "the only way he would give me my file is if I gave him $750."

_____

9. There was a one dollar error as the amount should have been $179.23 but the Respondent told Jefferson not to worry about it.

Jefferson went to the AGC "after countless times trying to get rid of" the Respondent. However, he wrote later a "To Whom it May Concern" letter to be sent to the AGC stating that he gave the Respondent power of attorney to represent him (Jefferson) in both cases and "will take no action against him" in either case. He testified that the Respondent "more or less told me what I should say" because he (Respondent) was having trouble with the AGC and he "had to get the people (AGC) off his back." Respondent told him to say that he (Jefferson) was satisfied and "didn't want to press anymore further charges on him." Actually Jefferson did not sign the letter because he "didn't really want to write it" but he figured it would be the only way that my case would ever possibly get settled." At that time, Jefferson had lost his job, had no income, and he felt that although he wanted to get rid of the Respondent (and had been trying to get rid of him since August of 1979) the "only way I could see it was settling the case."

On cross-examination, Jefferson testified that the Respondent had represented him only once (in 1975) before the First Case and that he (Jefferson) had paid the Respondent the outstanding balance then owed by him to the Respondent before the Respondent would represent him in the First Case. This was paid in full in cash "in front of Clarence Bowman and Richard Spell" and Respondent said "now everything is even." Jefferson denied that the money order in the amount of $178.23 paid over to the Respondent constituted the balance of the 1975 fee.

He also testified that he accepted the settlement in the Second Case even though he felt it was wrong and unjust because he couldn't do anything about it and he felt that the AGC "didn't have enough authority to do anything to" the Respondent. He felt that the "600 and something was a small fee" but the main argument was when the Respondent subtracted the PIP amount ($179.23). Jefferson had already paid the Respondent that amount but the Respondent told Jefferson that he (Jefferson) could not prove that.

Respondent questioned Jefferson as to changing his address without telling the Respondent, but Jefferson testified that Respondent "never really ascertained my (his) address even though I gave it to (him) three times." Actually his address was the same since 1979. Jefferson complained that the Respondent kept sending him correspondence to his old 1975 address (which was his mother's).

The Respondent, who chose not to be represented by counsel, testified that Jefferson owed him a balance of $200 from a criminal case which was *nol prossed*[10] and that said $200 would be taken out of any recovery in the First Case. He said he had never been paid this $200.

He conceded, however, that his retainer agreement mentions nothing about any "agreement" that the previous fee would be taken out of the recovery in the First Case. His explanation was that he (Respondent) did not sign his retainer agreement and that his wife—not him—prepared it. The agreement as to taking the previous fee out of the First Case recovery was oral, according to the Respondent. He never put anything about the "agreement" in writing because he and Jefferson got along well at that time.

He testified that he filed suit in the Second Case in the District Court but after it was "suggested" that he sue in the Court of Common Pleas, he did so. Service had been obtained upon Defendant Jones in the Second Case by a process server and thereafter, when the Respondent dismissed the District Court case, he sued in the Court of Common Pleas and achieved service by mailing a copy to the Defendant's attorney.

He further testified that Jefferson and Spell brought money orders ($179.23) to him (Respondent) and that he cashed these two money orders but that he gave back the case to them because Jefferson was out of work. So he "explained" the PIP matter by testifying that he (Respondent) "held" two-thirds to "protect" the "medical amount"

---

10. (armed robbery)

and while he endorsed Jefferson's money order for the remaining third, he returned that third in cash to Jefferson because Jefferson was out of work. He "assisted him in cashing" the money order.

When asked if Jefferson had indicated why Jefferson would buy a money order and just ask Respondent to "cash it" he replied that Spell influenced Jefferson to do so. At first he said that both Spell and Johnson brought the money orders to him but later he said Spell and Jefferson were not together. When confronted with the fact that the money orders were numbered consecutively (the Jefferson money order is 027504310 and the Spell money order is 027504311). Respondent's recollection was that Spell did not negotiate his money order at the same time Jefferson did because Spell "carried (his) money order around for quite some time." Incidentally, the Respondent never got a receipt for the money he said he gave to them.

Respondent admitted that he never deposited the PIP money into a separate account. He cashed the PIP check.

He denied that Jefferson told him of his address three times. He conceded "there was no payment to the Mercy Hospital" nor to Dr. Holt. He offered no explanation as to why he did not pay the hospital.

However, as to Dr. Holt, he testified that he had represented Jefferson during that time and afterwards and this "was one of the fees that Dr. Holt and I agreed to be part-payment for me." He stated that Dr. Holt's bill for the Second Case was $235 and that although he (Respondent) did not pay that amount to Dr. Holt, the Dr. agreed that Respondent "retain that as part-payment on his fee." [11] His agreement with Dr. Holt was not in writing, nor did he call Dr. Holt as his witness.

Respondent was mistaken about which case was which. He initially felt that the First Case involved Jones as the

---

11. Actually Respondent was mistaken. The bill of Dr. Holt for the Second Case was $430 as Respondent had admitted in his pleadings.

Defendant whereas Jones was the Defendant in the Second Case. He later admitted that the $430 bill of Dr. Holt was for the Second Case. As to the work that he (Respondent) had done for Dr. Holt [when Respondent testified that Dr. Holt had been his (Respondent's) client] he answered that he had no such bills for said work.

Respondent testified that he sent Dr. Holt $100 from the PIP money and that this $100 came "out of his pocket"—"out of his pants." As to the remainder of the PIP money, Respondent testified that he "gave" Jefferson one-third and that the rest was in his account "right there on the settlement sheet." Yet he conceded that the settlement sheet does not indicate anything about the PIP money. His explanation was that he still has that money "in the sense of Dr. Holt agreeing that I retain them."

As to how much Dr. Holt owed him, the Respondent testified that there was no flat bill. At different times "we would agree on how much he could afford to pay me." However, there was no documentation as to how much Dr. Holt owed the Respondent. The Respondent testified that he never knew how much the doctor owed him at any particular time. The Respondent conceded that he retained all of the PIP money except for the $100 sent to Dr. Holt. He felt that counsel *could* receive one-third of PIP *then* but "not now."

## B.   THE $750 DEMAND

When Jefferson asked Respondent for the files in both cases, Respondent told Jefferson that he (Respondent) wanted $750 to release the files for work he had done, money spent and money owed to Respondent by Jefferson. Jefferson had gone to a new attorney, one Michael H. Simons, Esq., who had written the Respondent (on January 2, 1980) advising Respondent that Jefferson had requested him to represent him and asked the Respondent to contact him to make arrangements to obtain information (the letter also enclosed a letter dated December 19, 1979 from Jeffer-

son to the Respondent discharging the Respondent). The Respondent received this letter but he did not correspond with Simons. Simons then wrote another letter dated January 28, 1980 to the Respondent confirming a phone conversation with the Respondent. In this letter, Simons indicated that he would protest Respondent's itemized expenses but noted that Respondent did not want to discuss the matter further. He reiterated that if the Respondent released the files or allowed copying, that he would honor the Respondent's invoice. Respondent received this letter too.

To show that he told Jefferson in writing what the $750 was for the Respondent pointed to an undated note entitled "To Whom it May Concern" and testified that it was given to Jefferson. This note dealt solely with the First Case and said that "I release" the papers concerning *this* accident in consideration of payment of advanced costs and a nominal fee." Although the Respondent listed various costs, all of these costs had to do with the Second Case except $19 that was expended in the First Case.

Respondent considered a "nominal fee" to be $300 to $350. In addition, Respondent wanted the $200 that he claimed was unpaid from the 1975 case.

The Respondent conceded ultimately that he never gave any breakdown to Jefferson nor Simons of the demanded $750. When asked what he wanted the $750 for, Respondent testified that it was for the return of both files. Yet when it was pointed out that the "To Whom it May Concern" letter mentioned only the First Case, the Respondent answered by saying that the omission of the Second Case was "probably a secretary's mistake."

## C. THE FIRST CASE

This accident happened on April 25, 1978, again with Spell driving and Jefferson a passenger. Jefferson received injuries and received medical treatment from Dr. Holt. Both Jefferson and Spell were represented by the Respondent. Petitioner's Exhibit 3 shows that the Respondent filed suit

**748**

on behalf of Jefferson in the District Court of Maryland for Baltimore City on January 18, 1979 and Petitioner's Exhibit 8 shows that suit was filed on behalf of Spell on the same date. The Respondent admitted that he represented Spell.

The Defendants in both the Jefferson and Spell cases were Milton Mack, Sr. and Jocelyn T. Mack. In the Spell case, the Defendants were summoned and their attorney (William F. Gately, Esq.) notified the court of February 27, 1979 that they would attend and elected a jury trial. Copy of this Notice and Election was sent to the Respondent. Thereafter, the case was removed to the Superior Court of Baltimore City. The Respondent filed answers to the Defendants interrogatories and appeared in a pre-trial settlement court all before another attorney entered his appearance for Spell on August 28, 1979.

However, there never was service against the Defendants in the suit that the Respondent brought on behalf of Jefferson. The Respondent told Jefferson that he was "working on it" and that Milton Mack was in the Military in Kentucky. However, the court file shows only "non-est, Cert. Mail Unclaimed" and that is all.

The Respondent conceded that both Jefferson and Spell were in the same accident involving Jocelyn Mack and he further conceded that he originally represented Spell and had answered interrogatories on behalf of Spell. When asked why service was able to be made and issue was able to be joined in the Spell case and not in the Jefferson case, the Respondent answered that the Macks would not accept the certified mail in the Jefferson case.

However, the Respondent never sought to reissue summons in the Jefferson case. Nor would Jefferson admit that he knew that the Defendants had been served in the Spell case despite the fact that he knew that the Defendants had a lawyer who had put him on notice that he (William F. Gately, Esq.) was going to defend the case against Spell. Respondent admitted that he did nothing in the Jefferson case to obtain service even though he knew that the Macks were represented with regard to the Spell case. His excuse

was that Jefferson wanted to take back the Mack case from him.

However, he admitted that he had told Jefferson that he would not "turn loose" either the Mack or Jones case unless Jefferson paid his "advanced costs, a nominal fee and his balance." His explanation was that as soon as Jefferson got another lawyer, he would strike his appearance. Yet he admitted that another attorney for Jefferson had written him to advise that he represented Jefferson and that the Respondent no longer did. He further admitted that Jefferson's new attorney had noted in his letter that he (Respondent) "would not discuss anything in regard to what monies" "he had expended in both of Jefferson's cases and he admitted that he had not sent any itemization of the $750. His explanation was that he wanted to confirm with Jefferson "face to face" that Jefferson wanted him out [despite Jefferson's letter to him which stated precisely that Jefferson wanted the Respondent out].

In the Second Case, the Respondent had used a private process server to obtain service. When asked why he did not use a private process server in the First Case, he answered by saying that "the Lawrence Powell[12] letters caused the spark of our problem." Yet despite the "problem" he admitted that he used nevertheless a private process server for Jefferson in the Second Case. His explanation was that "Jefferson took his Mack case. We agreed that I would not go any further on it after I had filed suit." He testified that Jefferson wanted to go to another attorney. However, he never struck his appearance.

### III. DETERMINATIONS

### A. RESPONDENT'S MISAPPROPRIATION OF THE PIP MONEY

This court finds by clear and convincing evidence that the Respondent misappropriated the entire PIP money ($537.70) received on behalf of his client, Jefferson.

---

**12.** It was Powers not Powell.

## 1. THE HOSPITAL BILL

It is undisputed that he failed to pay Mercy Hospital its bill of $107.70. Respondent admits this. He has no explanation for why he so failed to pay. Suddenly, he announces, in his Post Trial Memorandum (filed on July 22, 1983) that he had paid the hospital by his money order dated July 8, 1983. It is undisputed that he received the PIP draft on February 22, 1979, endorsed it, cashed it and failed to pay the hospital bill. He kept the hospital's $107.70 from February 22, 1979 through the time that he was brought before the Inquiry Panel, through the time that the AGC petitioned the Court of Appeals on April 4, 1983, charging him with violation of various Disciplinary Rules as the result of his failure to pay the hospital, and through the time that the Court of Appeals designated, on April 8, 1983, the Circuit Court for Baltimore City to hear and determine the charge, and through the hearing by the undersigned on July 6, 1983.

It was not until two days after this last hearing that he finally paid the hospital. Thus he kept improperly the PIP money for his own use from February 22, 1979 until July 6, 1983—a period of almost three and one-half years.

## 2. THE DOCTOR'S BILL

This court finds by clear and convincing evidence that the Respondent never ever paid Dr. Holt his medical bill of $430. The doctor testified that he had not been so paid.

The testimony of the Respondent is that he did pay the doctor by virtue of an "agreement" with the doctor that resulted in the Respondent "setting-off" a part of the money due him (Respondent) in unrelated legal matters where the doctor was the Respondent's client. I find this to be totally untrue. Moreover, the "evidence" that the Respondent paid $100 to the doctor (on February 23, 1979) I find to be totally false and indeed, fabricated.

First, as to the "agreement" to offset. The only evidence of an "agreement" comes from the testimony of the Respondent. The doctor, in *his* testimony, never mentioned

anything whatsoever about any such agreement. He testified that he had *not* been paid. Significantly the Respondent never asked the doctor any questions about such "agreement." Nor did he question him about payments to him. In fact, he never asked the doctor any questions at all. Nor did he call the doctor as his witness.

As to the so-called "offset" the Respondent did not even know how much the doctor's bill was with respect to the Second Case. At first, he testified that it was $235 but he had previously admitted that it was $430. He later admitted it was $430.

The Respondent could produce no writing to evidence the "agreement." As to what the doctor owed him for the "unrelated" work that he had done for the doctor, the Respondent had no bills whatsoever. Nor could he even tell what his (unwritten) bills were to the doctor. He testified that at different times, "we would agree on how much he could afford to pay me."

As to the so-called payment of $100 to the doctor, I find that it simply did not exist. The Respondent testified that he paid $100 to the doctor for Jefferson's case (the Second Case) on February 23, 1979 and "proved" it by Respondent's Exhibit 23, a paper which purports to be a copy of a letter under date of February 23, 1979, sent by Respondent to the doctor. I find that no such letter was ever sent. I find that there was no such letter written. I find it to be a complete fabrication. The "letter" mentions that the Respondent encloses a "check in the amount of $300 to be distributed as follows: ... $100 on fee for Stanley Jefferson." However the date of the check is not mentioned, nor the check number, nor the bank upon which it was drawn, and most significantly, the cancelled check was never produced by the Respondent.

The Respondent never asked the doctor whether or not he had received any such check. The "copy" of the letter allegedly sent by the Respondent is typed but it bears no indication of the initials of the secretary who typed it. It

may not have been typed by any secretary—it may have been typed by the Respondent himself—but the Respondent conceded that he had a secretary at the time in question—in fact he blamed her for mistakes as to other typings emanating from his office (for example, his assigning a mistake to his secretary when faced with a question as to why he failed to put both accident dates on his Respondent's Exhibit 7). Finally, the Respondent testified that the source of the $100 used to pay the doctor came "out of my pocket," that is "out of my pants." This court finds that Dr. Holt was never ever paid anything.

### 3. THE CLIENT'S $179.23

The Respondent testified that he held two-thirds of the PIP money ($537.70) to protect the "medical amount" and that Jefferson received the other third. Jefferson testified that he (Jefferson) had indeed received $179.23 from the Respondent but he also testified that he returned that sum (or rather $178.23—a one dollar mistake on his part that he freely admitted) one day later, on February 23, 1979. His reason was that by this time he was not satisfied with the Respondent's services, did not trust him and wanted to give all of the PIP money back "so that when the (Second Case) got settled, I could see everything at one time and I know that I was being treated fairly."

Unlike the Respondent's method of doing business, Jefferson paid for and procured a *written money order* payable to himself dated February 23, 1979 and endorsed it over to the Respondent. The Respondent *admits* that he endorsed it. So I find by clear and convincing evidence that the Respondent has had that sum of money ($178.23) from February 23, 1979 to the present.

The Respondent seeks to avoid this fact by saying that he (Respondent) returned this $178.23 (in cash) to the Respondent because he (Jefferson) was out of work. This testimony simply does not make sense and this court does not believe the Respondent. What would be the sense of a man paying $178.23 over to another man and then the other man

repaying it immediately to the original man? There *is* documentation for the payment of this sum *by* Jefferson (the money order) *to* the Respondent (Respondent's admission that he endorsed it) but there is *no* documentation that the Respondent paid it back to Jefferson—only the testimony of the Respondent that he paid it (in cash). There was no letter of confirmation by the Respondent, no receipt by Jefferson, nothing in writing whatsoever.

The Respondent testified that he merely "assisted" Jefferson in cashing the money order. However, when asked why Jefferson would buy a money order just to ask the Respondent to "cash it," the Respondent testified that Spell influenced Jefferson to do so. At first, he testified that Jefferson and Spell came in together to return their PIP monies to him but later he testified that they were not together. When confronted with the fact that the money orders were numbered *consecutively* (Jefferson's money order was 027504310 and Spell's was 027504311.

Petitioner testified that Spell did not negotiate his money order at the same time Jefferson did because Spell "carried (his) money order around for quite a time."

However, he also testified that *both* Jefferson and Spell came in and that he accommodated *them* "by cashing *these* money orders and giving *them* his money, *both of them.* He testified that he gave *Jefferson* back his money because Jefferson was out of work. What was his reason for giving *Spell* back *his* money? He did not testify as to any need on *Spell's* part. This sort of testimony is unbelievable.

### 4. THE PIP MONEY GENERALLY

The Respondent admitted that he never deposited the PIP money into a separate bank account. He simply cashed the PIP check and I find by clear and convincing evidence that he kept all of the cash ($537.70) for himself despite his testimony to the contrary.

### 5. DISCIPLINARY RULES VIOLATED

Hence this court finds by clear and convincing evidence that the Respondent has violated:

Disciplinary Rule 9–102(A) and Article 10, Sec. 44 of the Annotated Code of Maryland, *See AGC v. Garson*, 287 Md. 502 [413 A.2d 564] (1980); *AGC v. Bailey*, 286 Md. 630 [408 A.2d 1330] (1979) [Failure to place funds into a separate account]. ˙

Disciplinary Rule 1–102(A)(3)(4)(5) and (6), Disciplinary Rule 7–101(A)(3), Disciplinary Rule 7–102(A)(8) and Disciplinary Rule 9–102(B)(3) [the Respondent illegally and fraudulently converted all the PIP monies to his own use thereby prejudicing his client, Jefferson—these monies were not held in escrow]. *See AGC v. Bonnin*, 294 Md. 507 [451 A.2d 326] (1982); *AGC v. Boehm*, 293 Md. 476 [446 A.2d 52] (1982) [Respondent provided Jefferson with no records nor accounting of Jefferson's money. In fact, when the Respondent settled the Second Case with Jefferson, he retained improperly the $179.23 by subtracting it from the amount properly due Jefferson. This amounts to a misappropriation. *See AGC v. Pattison*, 292 Md. 599 [441 A.2d 328] (1982); *AGC v. Cooper*, 279 Md. 605 [369 A.2d 1059] (1977); *Bar Association v. Marshall*, [269] 264 Md. 510 [307 A.2d 677] (1973) ].

Disciplinary Rule 1–102(A)(3)(4)(5) and (6), Disciplinary Rule 7–101(A)(1), Disciplinary Rule 7–102(A)(8) and Disciplinary Rule 9–102(B)(3) and (4) [Illegally failed to distribute all the funds to which Jefferson was entitled; *See Marshall and Boehm, supra; AGC v. McIntire*, 286 Md. 87 [405 A.2d 273] (1979) [failure to seek Jefferson's lawful objectives through reasonably available means permitted by law; failure to keep complete records of funds of Jefferson coming into the Respondent's possession and render appropriate accounting to Jefferson].

B.  RESPONDENT'S NEGLECT AS TO THE FIRST CASE

This court finds by clear and convincing evidence that the Respondent neglected the legal matter entrusted to him by his client Jefferson, i.e., the First Case. This court further finds by clear and convincing evidence that the Respondent

failed to carry out the agreement that he made with Jefferson, i.e. to represent Jefferson properly in the First Case.

All the Respondent did as concerns the First Case was to file suit on behalf of Jefferson, against the Macks and send out a certified letter enclosing the suit to the Macks. The Macks did not acknowledge nor sign for the letter. The first accident occurred on April 25, 1978 but the Respondent did not file suit until January 18, 1979. The evidence does not show that the Respondent did anything further.

In the Second Case, the Respondent had used a private process server and was successful in achieving service in that case. In the First Case he did not use a private process server. He attempted to explain why not by saying that Jefferson wanted to take back the First Case from him. If that were the case, that would indicate that Jefferson was unhappy with the lack of progress being made by the Respondent and that fact should have spurred the Respondent to do something to alleviate the situation—at least to hire a private process server.

But I do not find that the Respondent's explanation (that he did not use a process server because Jefferson wanted the file back) rings true. Respondent waited almost nine months before he even instituted suit in the First Case. Even if Jefferson was unhappy and wanted to "take back" the case, *the Respondent would not give back the cases.* Jefferson tried to "get rid" of the Respondent in about August of 1979 and "all through 1980 and 1981 and all through the present day" but the Respondent would not let go of the First Case (or the Second Case) unless Jefferson paid him $750. When Jefferson could not pay $750 to the Respondent, as the Respondent "well knew" that meant that the *Respondent was still the lawyer for Jefferson.* Hence he could and should have utilized a private process server.

Moreover the Respondent represented Spell in the very same accident (First Case) and *had* achieved service in Spell's case. He was in touch with the attorney who

represented Spell, filed answers to interrogatories on behalf of Spell and still was unable to achieve service against the very same Defendants. Perhaps Milton Mack, Jr. was in the military but there is no indication that Jocelyn T. Mack was. In fact, the Respondent knew her address which was 2400 Loyola Southway—right in Baltimore City. *He did not ever reissue any summons for her.*

Coming back to his reason for failing to reissue and failing to use a private process server, Respondent testified that he would have released the file (or files) if Jefferson had paid him for work he had done, money he had spent and money that Jefferson owed him. I do not find this explanation to be true. He wants to explain his neglect of the First Case by arguing that he was having a problem with Jefferson. But I find that any problem that existed was caused by Respondent's neglect of the First Case. So his argument is circular. Even if this were not so, he was still Jefferson's lawyer despite Jefferson's attempt in August of 1979 to "get rid" of him (this was merely the first attempt by Jefferson to do so).

An analysis of the evidence shows that the Respondent's explanation that his neglect was caused by Jefferson's wanting the file back, is spurious. As to being paid for work done, the evidence shows that the Respondent and Jefferson had consummated a retainer agreement. So Respondent was entitled to a one-third percentage of whatever he recovered for Jefferson and if he recovered nothing he was entitled to nothing.

As to money he had spent, the only money that the Respondent had spent as regards the First Case was $19. Even though the Respondent was assured in writing that his expenses would be protected he failed to turn over his file to Jefferson's new attorney, one Michael H. Simons, Esq. The Respondent admitted that he had received Simons' letter dated January 2, 1980 which enclosed a letter from Jefferson *discharging the Respondent.* In the Simons letter, Simons informed the Respondent that Jeffer-

son wanted him (Simons) to represent him and sought information as to the First Case. However, the Respondent did not correspond with Simons. Simons then wrote a second letter (dated January 28, 1980) which confirmed a phone conversation with the Respondent. The second letter indicated that Simons would protect the Respondent's itemized expenses but noted that the *Respondent would not discuss that matter further.* So the net result was that although the Respondent *says* that he *would* turn over the file if he were paid for the money he had spent yet he would *not* communicate with Jefferson's new attorney with respect to what money he *had* spent.

Actually Respondent gave varying explanations of what it would take before he would release the files. Jefferson wanted back the files with respect to *both* accidents. At one point, the Respondent said that he wanted $750 for both files. Yet at another point, he testified that the proof of what the $750 was for was supplied by his Exhibit Seven (for identification). This was a "To Whom it May Concern" memorandum advising that "I release the papers concerning this accident (obviously the First Case since it says "accident date April 25, 1978") ... in consideration of payment of advanced costs and a nominal fee." Petitioner testified that a nominal fee meant "$300 or $350." Whatever version one accepts, the fact is that the Respondent never returned either file to Jefferson or his new attorney.

Hence the Respondent remained Jefferson's attorney. His attempt to explain his inaction and neglect by the excuse that Jefferson wanted back the cases is simply a smokescreen and totally unconvincing.

## DISCIPLINARY RULES VIOLATED

This court finds by clear and convincing evidence that the Respondent violated:

Disciplinary Rule 6–101(A)(3)

Disciplinary Rule 7–101(A)(2) and (3)

*See AGC v. Willcher,* 287 Md. 74 [411 A.2d 83] (1980)

## C. RESPONDENT'S FAILURE TO WITHDRAW FROM THE FIRST CASE

When Jefferson terminated the Respondent's employment, the Respondent failed to withdraw from the case as he was required to do. *See AGC v. Kerpelman*, 288 Md. 341 [420 A.2d 940] (1980). His reasons for not doing so have been set out *infra*. These reasons are totally unconvincing.

Respondent advances another reason for his failure to withdraw, that is, that he wanted to be paid a $200 balance allegedly owed him when he represented Jefferson previously in a *criminal* case. Aside from the fact that he had previously sworn under oath that it was a *civil* case, his reason is totally unconvincing because I find as a fact and by clear and convincing evidence that the $200 *was* paid to the Respondent. Jefferson so testified and he said it was done before two witnesses (Clarence Bowman and Mr. Spell). What is more is that Jefferson testified that the Respondent would not represent him with respect to the two accidents unless he was paid in advance.

Respondent testified that he and Jefferson "agreed" that the $200 would be taken out of any recovery made in the First Case. Yet this "agreement" is nowhere recorded. In fact, the Respondent had Jefferson sign two powers of attorney in connection with both the First Case and the Second Case but these documents do not mention any such agreement.

I find by clear and convincing evidence that the $200 was paid to the Respondent by Jefferson before the Respondent undertook to represent Jefferson in the First Case. Hence, the Respondent's testimony to the effect that he would not withdraw until paid this $200 is not believed.

The Respondent's demand that he be paid $750 before he would withdraw from the cases is found to be unreasonable and extortionate. I find that it was not based upon any substance or rationality. I find that he did not and would not account to either Jefferson or his later attorney (Si-

mons) for this $750. His attempt to use his Exhibit 7 (for identification) is totally unpersuasive. His in-court accounting (work done, money spent, money owed) is suspect because he demanded the very same amount ($750) from Spell when Spell wanted him to withdraw from Spell's case.

I find by clear and convincing evidence that the Respondent violated Disciplinary Rule 2–110(B)(4)

## D. RESPONDENT ENGAGED IN CONDUCT WHICH WAS PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE, WHICH ADVERSELY REFLECTED ON HIS FITNESS TO PRACTICE LAW, AND INVOLVED DISHONESTY

I find by clear and convincing evidence that while the Respondent knew that he was being investigated by the AGC, he got Jefferson to write a letter to be presented to the AGC, which letter was intended to fend off and block the investigation. I find further that this letter was induced by Respondent's representation to Jefferson that in exchange for the letter the Respondent would settle the First Case swiftly. However, I find that said representation was false.

Jefferson testified that the Respondent more or less told him what to say in the letter and that it was to be sent to the AGC. He further testified that the Respondent told him that he had been having trouble with the AGC and that Jefferson had to get them off his back. As to why he wrote the letter, he testified that the Respondent told him that he (Respondent) could "hurry up and settle the (First Case) if I wanted to get it settled." It is significant at this precise time, Jefferson needed money because he had lost his job.

I find that the Respondent told Jefferson to say that he (Jefferson) was satisfied and that he (Jefferson) "didn't want to press anymore further charges on him" and I further find that as the result of the Respondent's direction, Jefferson wrote that he "will take no further actions against (Respondent) involving either case."

I also find that Jefferson really did *not* want to write such a letter—in fact, he testified that his wife "said that she would not sign" and so Jefferson did not *sign* the letter. But he did *write* the letter, I find, as the result of the Respondent's representation that in this way the First Case would be swiftly settled.

I find that the Respondent never intended to settle the First Case swiftly. In fact the Respondent did nothing to settle the case and next to nothing to bring it to trial. Hence the Respondent made a false representation to a person whom the Respondent knew to be vulnerable in order to obtain an exculpatory letter—a letter designed to thwart a legitimate investigation of the Respondent.

Hence he has violated:

Disciplinary Rule 1–102(A)(4), (5) and (6)

Disciplinary Rule 6–102(A)

/s/   Marshall A. Levin

Marshall A. Levin, Judge

September 13, 1983

COLE, Judge, dissenting:

The record in this case makes two conclusions indelibly clear: (1) this is basically a dispute between a single client and his attorney and (2) the evidence may have been cast in a more favorable light for respondent had he not elected to be his sole witness as well as his own counsel.

In any event, I do not believe that respondent's misconduct calls for the ultimate sanction of disbarment. While the Court cannot overlook the fact of respondent's prior disciplinary experience before this Court, *Attorney Grievance Comm'n v. Howard,* 282 Md. 515, 385 A.2d 1191 (1978), a suspension for a lengthy period would be sufficient to protect the public interest as well as to impress the bar that respondent's conduct fell below the professional standards of this State.

I, therefore, dissent from the Court's order of disbarment.

Judge ELDRIDGE has authorized me to say that he concurs in the views expressed herein.